**John SKELTON, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 69215.**

Court of Criminal Appeals of Texas,
En Banc.

Dec. 13, 1989.

Rehearing Denied May 2, 1990.

Certiorari Denied Oct. 1, 1990.
See 111 S.Ct. 210.

David L. Botsford, on appeal only, Austin, for appellant.

R.C. "Eric" Augesen, Dist. Atty., Odessa and Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Presiding Judge.

After a lengthy trial appellant was convicted of capital murder. Punishment was assessed at death.

The evidence showed that on the morning of Saturday, April 24, 1982, an individual by the name of Joe Neal climbed into his pickup truck with the intention of taking one of his daughters to choir practice. Neal apparently turned on the truck's ignition, and put the truck in reverse. This act set off a bomb which had been placed under the truck. The explosion propelled Neal's body out of the truck, ripped off his left wrist and hand as well as both legs. Medical testimony indicated that Neal bled to death as a result of his injuries.

Testimony at trial showed that upon viewing the scene of the explosion, authorities found pieces of a 6-volt K–Mart lantern battery and two halves of a broken horseshoe magnet wrapped with duct tape. Vance Johnson, an agent with the Bureau of Alcohol, Tobacco, and Firearms testified that in his expert opinion the explosion was caused by more than two or three sticks of dynamite which were hooked up to the electrical wiring leading to the back up lights of the pickup truck. The bomb was attached so that when the truck was placed in reverse, it would detonate. He further testified that in his opinion the 6-volt battery was used as a backup power source in case the electrical system of the truck failed. It was also his opinion that the bomb was placed directly underneath the floorboard area of the driver's side of the truck. Jerry Taylor, another agent from the Bureau of Alcohol, Tobacco, and Firearms, testified that he estimated that the bomb was made up of four to seven sticks of dynamite. He also felt that the bomb had been placed directly under the floorboard areas of the driver's side of the truck. Dr. Elliot Byall, chief of the Forensic Branch of the Bureau of Alcohol, Tobacco and Firearms Lab in San Francisco, testified that he conducted tests on gauze swabs that had been taken from the victim and ascertained the presence of dynamite vapors and nitroglycerin, one of the components of dynamite.

Testimony at trial connected appellant to the offense. Robbie Smart, who characterized his relationship with the appellant as a father-son relationship, testified that up until 1981, appellant had owned Husky Steam Cleaners. Smart testified that he began working for appellant at Husky in 1975. He was promoted to plant superintendent in 1980 and essentially ran the business for appellant who traveled frequently. Smart related that the victim came to work for Husky as a salesman in 1979. The victim left Husky's employment in 1980 after appellant accused him of selling hot tanks produced by Husky and keeping the money from the sales for himself. Appellant also thought his own son, Jerry Don Skelton, and another salesman, Bob Fowler, were also involved in the scheme. Smart testified that on several occasions appellant discussed having someone break the arms of both Fowler and the victim, and on one occasion, appellant told Smart that he had a cousin in prison who would help him find

someone to do the job. Smart testified that appellant also threatened to break the arms of two other individuals who were business competitors, a Mr. Berryhill and Glen Danielson. Appellant also told Smart that in June of 1981 that he had tried to file false theft charges against the victim and Fowler. As part of this plan appellant had given two steam machines to two men in Andrews, Texas, in exchange for their agreeing to falsely testify that the victim and Fowler had sold them the machines for cash and pocketed the money. Appellant also admitted this during his own testimony. Smart also testified that on one occasion appellant told him that he had hired someone to firebomb American Steam Cleaners in Odessa. American Steam Cleaners was owned by appellant's competitor, Berryhill, and both the victim and Fowler had gone to work there after leaving appellant's employment. Smart related that he did not believe appellant's threat regarding the firebomb, but several days later American Steam Cleaners was indeed fire bombed. Not content with that, in August of 1981, appellant told Smart that he was going to kill the victim. Appellant said that he was going to catch the victim in his truck and shoot him. Appellant also said that he knew the victim always carried a gun and if the gun was not there, he would plant one on him after he had killed him. When Smart tried to dissuade appellant, appellant's only answer was that he also wanted to kill Danielson, Fowler and his son, Jerry Don Skelton.

In January of 1982, appellant again told Smart that he was going to get even with the victim and Fowler. In March of 1982, appellant came to Smart's house and said he was working on a project and needed four horseshoe magnets. He said he had a surprise for the victim and that Smart would be surprised when he heard about it. Appellant told Smart to go out to Husky (which had since been sold to a partnership) and take four magnets from their inventory. Smart was to give these magnets to appellant and then order four new replacement magnets. However, Smart was told not to put the replacement order on the books. When Smart cautioned appellant

that the magnets could be traced, appellant told Smart that if he followed directions, everything would be all right. Appellant told Smart that he was going to "scare the shit out of some people." On March 25, 1982, Smart removed the four magnets from the Husky Parts Department. The next day he gave them to appellant. Appellant told Smart that on a recent trip through the South, he had met some trained mercenaries who had showed him a lot about explosives. On April 8, 1982, Smart ordered some new magnets to replace the ones he had taken from Husky. On April 19, appellant called Smart and asked if the new magnets had come in. When Smart told him that they had not, appellant remarked that they should be in in a day or two. Then he told Smart that if something spectacular happened to send the newspaper clippings to some friends of his in Arkansas. Smart testified that the magnets did not come in until April 28, four days after the bombing.

Smart testified that he was out of town during the weekend of the bombing. Upon learning of the bombing after his return, he was shocked. On Friday, April 30, he took the new magnets back to Husky as appellant instructed. Finally Smart testified that he received a call on May 6, from a man named L.C. Neatherlin, who was related to appellant by marriage. Neatherlin asked Smart to come to his business at 10:00 the next morning to fix a steam cleaner. When Smart arrived the next morning, Neatherlin took him into an office, handed him the phone and told him that appellant wanted to speak to him. When Smart told him that the victim had been killed, appellant replied that he hated to hear it but he could not say he was sorry. Appellant also told Smart that he was in Arizona at the time of the bombing and had alibi witnesses who would testify to that fact. Appellant asked Smart not to tell the police that he had called. Finally Smart testified that a few days prior to his testimony, he had received a phone call during which the caller said that both he and his daughter were dead.

Ron Masterson, the owner of a distributorship for steam cleaning equipment in Springfield, Tennessee, testified that he had known appellant for approximately five years. In March of 1982, appellant called Masterson and asked him to try to find him some dynamite. Appellant said that he needed twenty sticks of dynamite and ten blasting caps in order to remove some stumps from his farm in Arkansas. After this initial request, appellant called some six to seven times over the next few days inquiring about the dynamite. During these conversations, appellant also told Masterson that he was living in Springfield, Missouri, with a doctor named Judy Parton. On April 4, 1982, appellant came to see Masterson. The next morning they obtained ten sticks of dynamite and blasting caps from a contractor friend of Masterson. When Masterson asked appellant if he knew how to use the dynamite, appellant replied that the dynamite would explode if the wires leading from the blasting caps were hooked up to the terminals of a 6-volt battery. Appellant then placed the dynamite in an ice chest and sealed it with duct tape. He then put the ice chest inside of a hot tank (used in steam cleaning) which Masterson was returning to appellant. The hot tank was then bolted and the threads on the bolt were then damaged so as to prevent anyone from opening the box. Appellant then put the hot tank in the back of his pickup truck. On April 6, appellant left Tennessee and returned to Missouri. Between April 6 and April 14, appellant called Masterson several times. Each time, appellant told Masterson that he had not yet used the dynamite.

Leonard Robinson, the parts manager for Husky Cleaning Systems, testified that he checked his magnet inventory on April 27, 1982. He was surprised to find only one magnet when there should have been five. A few days later, Robbie Smart brought back four magnets and said that he was returning them because he did not need them. After Smart left the shop, Robinson went back and checked the magnets. He testified that he was surprised to see that the boxes they were in were not dusty and showed no signs of ever having been marked with a price.

Danny Kirby, supervisor of the DPS laboratory in Houston, testified that he was given State's Exhibit 95 (a piece of wrapper taken off a stick of dynamite obtained by the police from Blevins Ditching and Excavating Company in Jamestown, Tennessee), State's Exhibit 96 (a scrap of dynamite paper found in the vehicle behind the driver's seat after the blast) and State's Exhibit 89 (long fibrous materials found with several pieces of metal at the bomb scene). State's Exhibit 95 had been removed from a piece of dynamite manufactured by the Austin Powder Company with a date shift code of 2C0254. Earlier testimony revealed that all of the dynamite purchased by the excavation company between March 8, 1982 and April 23, 1982 had the same date shift code, indicating it was manufactured on the same shift. No testimony was given as to the date on which the dynamite given to appellant was purchased by the excavation company nor what date shift code was on the dynamite given to appellant. Kirby testified that after his scientific analysis he determined that all of the papers had the same chemical origin. He also testified that he had been asked to test State's Exhibits 69 and 71 (the parts of a magnet found at the scene of the explosion), State's Exhibit 84, (the magnets returned to Husky by Robbie Smart after the explosion) and State's Exhibit 88 (the sole magnet remaining in the Husky inventory after Robbie Smart removed four magnets and gave them to appellant). After running tests on these exhibits, he came to the conclusion that the paint on all the magnets had the same chemical properties.

Appellant presented several alibi witnesses who testified that appellant was in Springfield, Missouri on April 23 and April 24. A Springfield pharmacist testified that he filled three prescriptions for appellant sometime between 6 p.m. and 9 p.m. on the day of the murder, April 24th. Dr. Judy Parton, a friend of appellant's and a physician in Springfield testified that appellant took her to work on the morning of April 23 and picked her up at 3 p.m. that afternoon. They spent the evening together

and then had breakfast together on the morning of April 24. She then went to work and appellant picked her up around 4:00 p.m. that afternoon. According to Dr. Parton, appellant stayed in the Springfield area until April 27.

After presentation of the defense case, the State offered rebuttal. Warren Heagy, an attorney and half owner of Husky Cleaning Systems, Inc. testified that after he and his partner had purchased the company from appellant in May of 1981, appellant told him he suspected the victim and an individual named Bob Fowler had been stealing from him while they both had been employed as salesmen for appellant. Appellant showed Heagy two invoices which purported to reflect a sale of a steam unit by each salesman. According to appellant, the men were stealing steam units from appellant and then selling them for cash. Heagy testified that he noticed that the invoices were both dated some six months after both salesmen had left appellant's employment. Furthermore, the invoices were consecutively numbered and the invoice supposedly prepared by the victim was full of typographical errors which was extremely unusual since the victim was an excellent typist. Heagy testified that appellant quizzed him about the possibility of both men going to the penitentiary. When Heagy told appellant that they would probably get probation, appellant said that that he would take care of them in his own way. Heagy related that appellant seemed obsessed with the two men.

Another witness, John Campbell, testified that he had business dealings with both appellant and the victim. Campbell related that appellant told him he hated the victim and wanted to kill him. When Campbell asked if appellant was going to shoot the victim, appellant replied in the negative. Appellant further replied that shooting the victim with a gun would be too easy and he wanted to make him suffer. Skelton also told Campbell that he had been a demolitions expert in the military. On another occasion appellant told Campbell that he was going to falsely accuse the victim and Bob Fowler of stealing equipment from him in order to get them convicted and sent to the penitentiary.

In an attempt to rebut appellant's alibi witnesses the State also called Sheridan Carol Kirkland to the stand. Kirkland, a former neighbor of appellant testified that she saw appellant driving down an Odessa street at 3:00 p.m. on April 25, 1982, the day after the bombing. Kirkland testified that she noticed at that time that appellant looked especially tired.

Another neighbor, Carrie Scholl, testified that appellant called her the evening of the bombing. When she told him about the bombing, he appeared to be shocked. After her testimony the State rested.

In his portion of rebuttal, appellant introduced evidence showing that the call to Carrie Scholl had been made from Room 404 of the Interstate Inn Motel in Springfield, Missouri.

During this portion of the case, appellant took the stand. He related that he obtained the dynamite in Tennessee for the purpose of blowing up tree stumps on his farm in Arkansas. However, he was never able to use the dynamite for that purpose because it was stolen out of his truck in Springfield, Missouri. He also related that he was in Springfield, Missouri from April 16 to April 26 and during that time he stayed in Room 404 of the Interstate Inn Motel. He testified that he called Carrie Scholl on the evening of April 24 in an attempt to locate his wife, and when Scholl told him that "Joe Fowler" had been killed by an explosion, he thought she was kidding. Appellant also admitted talking to Robbie Smart over the telephone on May 7. He testified that he called Robbie at O.C. Neatherlin's Fiat dealership to discuss the repair of Neatherlin's steam cleaner by Robbie. It was during this conversation that Robbie told him that Joe Neal had been killed and that the police wanted to talk to him. Appellant denied that he had ever received any magnets from Robbie Smart.

In his sixth and seventh points of error, appellant argues that the evidence is insufficient to convict him either as a sole actor or as a party. The indictment in the in-

stant case contained two paragraphs. The jury was charged on the first paragraph which alleged that appellant did:

"knowingly and intentionally while in the course of committing and attempting to commit arson of a vehicle owned by Joe Neal, intentionally cause the death of Joe Neal, hereafter styled the Complainant by placing an explosive weapon on the vehicle of the Complainant, and causing said weapon to explode."

In addition, the jury was charged that they could convict appellant either by his acts alone or as a party. The verdict of the jury does not indicate whether they found appellant guilty as a party or as acting alone.

■ In both circumstantial and direct evidence cases the standard by which evidence is reviewed is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Houston v. State*, 663 S.W.2d 455 (Tex.Cr.App.1984); *Carlsen v. State*, 654 S.W.2d 444 (Tex.Cr.App.1983); *Butler v. State*, 769 S.W.2d 234, 238 (Tex.Cr.App. 1989). In *Denby v. State*, 654 S.W.2d 457, 464 (Tex.Cr.App.1983) (Opinion on Rehearing), this Court noted that "if the evidence supports an inference other than the guilt of the appellant, a finding of guilt beyond a reasonable doubt is not a rational finding." Proof which amounts to only a strong suspicion or mere probability is insufficient. It is the appellate courts' function to ensure that no one is convicted of a crime except on proof beyond a reasonable doubt.

■ After viewing the evidence in the light most favorable to the verdict, as we are constrained to do, *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), we find that we agree with appellant as to both points. Although there is plentiful evidence to show that appellant made numerous threats against the victim and that two weeks before the offense he was in possession of materials similar to those used in the commission of the offense, we find no evidence which connects appellant with the actual setting of the bomb, nor is there any evidence showing that he solicited, encouraged, directed, aided or attempted to aid another individual to

place the bomb. V.T.C.A., Penal Code, Section 7.02(a)(2). The evidence, even when viewed in the light most favorable to the verdict, suggests at least one hypothesis other than the guilt of appellant: that is, that someone else unbeknownst to appellant committed the offense.

The only evidence which even comes close to linking appellant to the actual placing of the bomb is the fact that in late March or early April, appellant obtained eleven sticks of dynamite from Blevins Ditching and Excavating Company in Jamestown, Tennessee. In addition, the State produced testimony that on March 20, appellant had asked Robbie Smart to procure four magnets for him from the Husky Steam Cleaning inventory, but not to put the transaction on the books. Instead Smart was to substitute new magnets in their place. The State, in its argument to the jury at the conclusion of the guilt-innocence phase relied heavily on testimony from Danny Kirby, the supervisor of the DPS lab in Houston, in arguing that the scraps of dynamite paper and pieces of magnet found at the scene of the blast could be tied to appellant. The State in that argument misconstrued Kirby's testimony and because of that misconstruction we now set out Kirby's testimony in some detail to show how the State's case was deficient.

As noted above, Kirby testified that he was given State's Exhibit 95 (a piece of wrapper taken off a stick of dynamite obtained by the police from Blevins Ditching and Excavating Company in Jamestown, Tennessee), State's Exhibit 96 (a scrap of dynamite paper found in the vehicle behind the driver's seat after the blast) and State's Exhibit 89 (long fibrous materials found with several pieces of metal at the bomb scene). State's Exhibit 95 had been removed from a piece of dynamite manufactured by the Austin Powder Company with a date shift code of 2C0254. During the State's direct examination of Kirby, the following testimony was elicited:

"Q. And would you tell the—are these the items that you did the comparison

on to locate fibers from the paper of the dynamite?

"A. Yes.

"Q. All right. Now then, would you please tell the jury how you tested these items to come to any type of conclusion?

"A. Okay. The fibers found here in these pieces of metal, also the pieces of metal inside here were upon the surface of the metal and I removed those fibers from that fibrous material and looked at them microscopically and also ran a solubility test, or a second solubility test and a G.C. Pyrolysis. I did the same for State's Exhibit No. 96 which is the brown rolled paper substance which was found in the Neal vehicle, and the same—I removed some of the wrapper material that was submitted by Frankie Hodges which is State's Exhibit 95 and ran the same test on those. The results were these fibrous material found on all of these did have the same chemical and physical properties.

.  .  .  .  .

"Q. Did you examine [State's Exhibit 89]?

"A. Yes, I did.

"Q. And you did then also examine State's Exhibit No. 95, the dynamite wrapper submitted by the Alcohol, Tobacco & Firearms from the Ike Blevins place of business?

"A. Yes, I did.

"Q. And you did also examine State's Exhibit No. 96, a piece of fibrous material found in the back of the Joe Neal vehicle, and you did conduct those tests; is that correct?

"A. Yes, I did.

"Q. And all those match?

"A. Yes, they do."

During cross-examination the following occurred:

"Q. And your examination into those three exhibits, 95, 96 and 89 just showed they were the same type of paper?

"A. The same type of material, yes, sir.

"Q. Under accord with the three tests that you made there were no dissimilarities?

"A. No dissimilarities that I noticed.

.  .  .  .  .

"Q. And those tests merely indicated that all of those items could have had a common origin?

"A. Yes, sir.

"Q. And could not have a common origin?

"A. I am sorry?

"Q. And could not have had a common origin?

"A. And may have not had."

Viewing this testimony in the light most favorable to the verdict, there is nothing in this testimony which shows that the dynamite obtained by the appellant, was the same dynamite used in the explosion. At most it demonstrates that the paper used to wrap the various sticks of dynamite was made out of the same ingredients. This evidence does not foreclose that someone other than appellant could have obtained dynamite wrapped in the same kind of paper and made a bomb with which to kill the victim.

Similar evidence was adduced concerning the various magnets involved in the case. Kirby was asked to test State's Exhibits 69 and 71 (the parts of a magnet found at the scene of the explosion), State's Exhibit 84, (the magnets returned to Husky by Robbie Smart after the explosion) and State's Exhibit 88 (the sole magnet remaining in the Husky inventory after Robbie Smart removed four magnets and gave them to appellant). Kirby testified that he performed three types of tests on paint scrapings taken from the magnets:

"Q. So to the best of your scientific knowledge, and based on your scientific analysis, the properties contained in all of those magnets, the ones submitted by Detective Smith from Husky, the one submitted by the crime scene and the one submitted by Detective Smith in the group basically have all the same characteristics?

"A. Yes, especially the paints.

. . . . .

"Q. So the best of the scientific state in the art of analysis at this time, through all the testing that you have done and been experienced with, those magnets have the same properties?

"A. Yes, and the paints do. I should clarify that the paints and the magnets do."

On cross-examination, the following occurred:

"Q. Your test of the red paint on the magnet has indicated they were all painted with the same kind of paint?

"A. Yes, sir.

"Q. As are probably millions of other objects in the world?

"A. I don't know.

"Q. But there could be innumberable things that are painted with that same kind of red paint?

"A. There again, I am not sure. I am not sure where the paint came from, what they utilize that particular paint for other than magnets.

"Q. Right. But the magnets were just all painted with the same kind of red paint. That is all that means?

"A. Yes, sir.

"Q. And it would be if Joe Neal had owned that red magnet like that, it would be the paint would match on that; wouldn't it?

"A. I didn't test one. I don't know.

"Q. Right. But all that shows was that those three magnets were painted or all those magnets were painted with the same red paint?

"A. Yes, sir.

"Q. And it is probably safe to assume that every magnet that that company ever made was painted with the same kind of red paint?

"A. It may be. It is possible, yes, sir."

Although the evidence against appellant leads to a strong suspicion or probability that appellant committed this capital offense, we cannot say that it excludes to a moral certainty every other reasonable hypothesis except appellant's guilt. *Nathan v. State,* 611 S.W.2d 69 (Tex.Cr.App.1981); *Flores v. State,* 551 S.W.2d 364 (Tex.Cr. App.1977). Specifically, there remains the outstanding possibility that someone other than appellant committed the offense.

This Court encountered a similar situation in *Nathan v. State,* supra. In *Nathan,* the victim's body was discovered on a Texas beach a little over four years after the victim's disappearance. Nathan was convicted of murder with malice. On appeal, Nathan argued the evidence was insufficient to prove that he committed the offense. The States' evidence showed the following:

"(1) The deceased, a man of regular habits who was planning a trip to Louisiana the next day, left his home on the morning of October 6, 1972, to collect a debt or debts. He usually carried $200.00 to $300.00 or more dollars in cash. He never returned home.

(2) The deceased indicated that morning to the witness Ford he intended to see the appellant about a debt due him.

(3) The deceased was placed at the Sunlight Baptist Church on that date inquiring about the appellant.

(4) The deceased was seen leaving the area of the church with the appellant in his car on Cedar Street about 10 a.m. on October 6, 1972. This was the last time he was seen alive.

(5) The appellant called his place of employment at 2:45 p.m. on the date in question and said he could not drive the afternoon school bus.

(6) When the deceased did not return home at 8 p.m. on October 6, 1972, a search led to the appellant, who took relatives to the Sunlight Baptist Church where he claimed he had last seen the appellant working on his car. The car was found there and was in working order. Appellant was described by witnesses as being nervous and acting strange and attempting to lead them on 'wild goose chases.'

(7) Leroy Broussard testified that while searching for his uncle with the appellant the next morning (October 7, 1972) the appellant had displayed a pistol and stat-

ed a spot on the back of his car was rabbit blood. Appellant also told police officers the spot was rabbit blood. When the car was turned over to the police for examination, it appeared to have been washed and the seats appeared to have had water or other fluid used on them.

(8) A chemist testified that some of the stains in appellant's car were of human blood but could not be typed. It could not be determined whether other blood stains were human or animal.

(9) Dr. Jachimczyk testified the bullet holes in the shirt were made by a .32 caliber weapon or a small weapon.

(10) The police found .32 caliber shells in the compartment of appellant's car.

(11) The remains contained coins, etc., as earlier described but no billfold or wallet with cash as normally carried by the deceased was found.

(12) Although the appellant was unable to pay the full amount of a motel bill on October 4, 1972, he was able to pay the balance several days later. And on October 7, 1972, he gave $123.00 to Shirley Little and paid a gasoline bill and other bills about that date. It was shown he spent $271.40 from October 7th through October 9th.

(13) Over three years after the disappearance of the deceased in November, 1975, the appellant told his current girlfriend, Vera Jones, during an argument over the termination of their relationship that he had 'got rid of one person' and could 'get rid of another' and no one would find out." 611 S.W.2d at 76–77 (footnote omitted).

This Court after reviewing the evidence found that although the proof cast great suspicion on Nathan, the State had not succeeded in excluding every other reasonable hypothesis. Thus Nathan's conviction was reversed and an acquittal was entered.

The case of *Flores v. State,* supra, is also very similar. *Flores* was a murder case in which the most damaging evidence against the defendant was that he was found in possession of the deceased's car approximately twenty-four hours after the de-

ceased was last seen alive. When Flores was arrested some six weeks later he was still in possession of the deceased's car, the car bore license plates which had been issued to another car and there was evidence that Flores had recently stored a suitcase with many items belonging to the deceased. While finding that the evidence cast great suspicion on Flores, this Court found that the evidence did not exclude to a moral certainty every other reasonable hypothesis except the appellant's guilt.

We see no difference between *Nathan, Flores* and the instant case. Although this Court does not relish the thought of reversing the conviction in this heinous case and ordering an acquittal, because the evidence does not exclude every other reasonable hypothesis, we are compelled to do so. The judgment is reversed and an order of acquittal is entered. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

MILLER, J., dissents.

WHITE, J., not participating.

BERCHELMANN, Judge, dissenting.

I dissent. I believe the evidence sufficiently supports the jury's verdict of guilt.

The standard of review for sufficiency claims is whether, viewed in the light most favorable to the judgment, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Butler v. State,* 769 S.W.2d 234 (Tex.Cr.App.1989). This identical standard applies to sufficiency challenges involving circumstantial evidence cases. *Id.*

In the case at bar, appellant had the motive; indeed, the express intention, to kill the victim. Appellant acquired horse shoe magnets and dynamite—key ingredients to the bomb—shortly before the victim met his death. Appellant indicated something "spectacular" that would make the newspapers was going to happen. Appellant's dubious claim that the dynamite was stolen from his truck, along with appellant's bizarre series of phone calls to Robbie Smart and Carrie Scholl, also implicate

appellant. Furthermore, given that the jury received a "parties charge" in this case, I would find the evidence sufficient to exclude every other reasonable hypothesis other than appellant's guilt. *Willis v. State,* 785 S.W.2d 378 (Tex.Cr.App.1989).

Accordingly, I respectfully dissent.