**Inez RAMIREZ, Appellant,**

**and**

**Nick Carr, Appellant,**

**and**

**Luis Minton, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**Nos. 04–88–00424–CR—04–88–00426–CR.**

Court of Appeals of Texas,
San Antonio.

July 25, 1990.

Rehearing Denied Nov. 21, 1990.

See also 783 S.W.2d 803.

Edward A. Mallett, Houston, Gerald H. Goldstein, Goldstein, Goldstein & Hilley, Nancy B. Barohn, San Antonio, for appellants.

Rogelio F. Munoz, Dist. Atty., Uvalde, Alberto M. Ramon, Eagle Pass, for appellee.

Before BUTTS, CHAPA and PEEPLES, JJ.

## OPINION

PEEPLES, Justice.

Appellants were tried jointly before a jury and each was convicted of conspiracy to commit bribery. The court assessed punishment for each at eight years' confinement, which was probated, and a $5,000 fine. In addition, appellant Carr was ordered to pay $18,000 restitution and appellant Minton was removed from his elected office. While the appellants raise various points of error in their separate briefs, each appellant challenges the sufficiency of the evidence and raises other issues. Because we hold that the evidence was insufficient to support the conviction in each case, we need not address appellants' other contentions.

In order to review the sufficiency of the evidence, a rather extensive discussion of the evidence adduced at trial is necessary. While we must review the sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict, *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979), we believe that because of the complex facts involved, it would be helpful at this point to summarize all of the relevant evidence. In 1985, Nick Carr owned a building in Eagle Pass that was commonly referred to as the CEP building. At that time, Inez Ramirez was president of the Board of Trustees of the Eagle Pass Independent School District and Luis Minton was a county commissioner in Maverick County. Early in 1985, Carr made a proposal to sell the CEP building to the school district. On July 8, 1985, the school board met to discuss the possibility of buying this building for the purpose of consolidating the school district's offices. At that time, the district's offices were scattered around the city of Eagle Pass and there was a general consensus on the board that consolidation would be more efficient. Board members also expressed concerns that the district was wasting money on upkeep of properties it was renting and that the leases on those properties were about to expire. The board voted five to two to have a feasibility study conducted to determine if the CEP building was a suitable choice for consolidation. On July 10, 1985, Carr and Minton approached Dan Bustamonte, the superintendent of the school district. Carr asked Bustamonte if he was going to oppose the purchase, and informed him that one of the members who was opposed to the purchase would not be present for the vote. Minton relayed a message from Ramirez and another board member that they had the votes and were going to purchase the building, and that Bustamonte should not oppose the purchase. Bustamonte testified that there was nothing unusual about this meeting

and that he was not pressured or coerced. A special meeting of the board was held on July 30, 1985. Three members, including Ramirez, voted for the purchase of the CEP building, and two members voted against it. Bustamonte, as superintendent, had no vote. Two board members were not present for the vote, but later testified that they would have voted against it. These members had notice of the meeting, though, and were not tricked, coerced, or bribed into not participating.

The board paid Carr $425,000 in two installments. The first payment of approximately $210,000 was made in September 1985. Most of that payment went directly to pay outstanding loans on the building, and Carr actually received approximately $36,000. The second payment of $212,500 was made in January 1986.

Between the first and second payments, Minton filed for reelection to his position as county commissioner. Approximately two weeks after the second installment was paid, and a month after Minton filed for reelection, Carr wrote a check to Ramirez (the school board member) for $1500. Several more checks were paid to Ramirez at approximately two-week intervals until a total of $11,500 had been paid. Minton was reelected in a run-off election on June 7, 1986. The last check written by Carr to Ramirez was dated June 13, 1986.

Soon thereafter, a grand jury began to investigate the purchase of the CEP building and the checks written to Ramirez by Carr. Carr, Ramirez and Minton all testified before the grand jury that the checks were contributions to Minton's reelection campaign. Minton did not report this money, however, and he never filed a final campaign report as required by law. Minton testified before the grand jury that his campaign received $11,200 from Carr, but that that figure was supplied to him by Ramirez. He testified that he, personally, received only $600 from Carr through Ramirez, all of which was spent on the campaign. He later wrote a letter to the grand jury attempting to clarify this.

On January 15, 1988, the grand jury indicted Carr, Ramirez, and Minton for con-spiracy to commit bribery. The indictment alleged that appellants agreed among themselves, with the intent that bribery be committed, that Carr would confer a pecuniary benefit upon Ramirez as consideration for his vote to purchase the CEP building. Minton's apparent alleged role was to provide a cover-up for this payment by declaring that the checks given to Ramirez by Carr were actually contributions to Minton's reelection campaign.

All of the appellants challenge the sufficiency of the evidence to support their convictions. In reviewing the sufficiency of the evidence, this court must determine whether, considering the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *Little v. State*, 758 S.W.2d 551, 562 (Tex.Crim.App.), *cert. denied*, 488 U.S. 934, 109 S.Ct. 328, 102 L.Ed.2d 346 (1988). This is the standard of review in both direct and circumstantial evidence cases. *Butler v. State*, 769 S.W.2d 234, 238 (Tex.Crim.App.1989); *Dickey v. State*, 693 S.W.2d 386, 387 (Tex. Crim.App.1984).

In applying this standard to circumstantial evidence cases, however, we must consider whether the circumstances exclude every other reasonable hypothesis except that of the guilt of the accused. *Butler v. State*, 769 S.W.2d at 238 n. 1; *Humason v. State*, 728 S.W.2d 363, 366 (Tex. Crim.App.1987); *Carlsen v. State*, 654 S.W.2d 444, 449 (Tex.Crim.App.1983) (opinion on rehearing). If the evidence supports a reasonable inference other than finding the essential elements of the crime, then no trier of fact could rationally find the accused guilty beyond a reasonable doubt. *Carlsen v. State*, 654 S.W.2d at 449–50; *Freeman v. State*, 654 S.W.2d 450, 456–57 (Tex.Crim.App.1983) (opinion on rehearing); *Denby v. State*, 654 S.W.2d 457, 464 (Tex. Crim.App.1983) (opinion on rehearing). Proof that amounts to only a strong suspicion or mere probability of guilt is insufficient to support a conviction. *Humason v.*

*State,* 728 S.W.2d at 366; *Moore v. State,* 640 S.W.2d 300, 302 (Tex.Crim.App.1982).

█ Appellants were convicted solely on circumstantial evidence. They assert that this evidence was insufficient because it failed to negate a reasonable hypothesis of innocence—that Ramirez voted for the purchase of the CEP building because he believed it was an appropriate site to consolidate the school district's offices; the series of checks written by Carr to Ramirez were contributions to Minton's campaign, for which Ramirez was an unofficial treasurer; and Minton failed to report Carr's contributions due to negligence or intimidation by the grand jury. We agree.

█ It is not necessary to prove all of the elements of the underlying offense in a conspiracy case. *Brown v. State,* 576 S.W.2d 36, 41 (Tex.Crim.App.1978); *Skidmore v. State,* 530 S.W.2d 316, 320 (Tex. Crim.App.1975); *see also McCann v. State,* 606 S.W.2d 897, 898 (Tex.Crim.App.1980) (commission of substantive offense is not essential element of conspiracy). This is because conspiracy to commit a crime and commission of the substantive offense which is the object of the conspiracy are separate and distinct offenses. *McCann v. State,* 606 S.W.2d at 898; *Farrington v. State,* 489 S.W.2d 607, 609 (Tex.Crim.App. 1972); *Turner v. State,* 720 S.W.2d 161, 162 (Tex.App.—San Antonio 1986, pet. ref'd). Thus, in order to support a conviction for conspiracy to commit bribery, it was not necessary for the State to prove that the completed offense of bribery was committed. It was, however, necessary to prove that each appellant agreed, with the intent that a felony be committed, "that they or one or more of them engage in conduct that would constitute the offense" of bribery. TEX.PENAL CODE ANN. § 15.02(a)(1) (Vernon 1974). This agreement may be shown by circumstantial evidence. *Farrington v. State,* 489 S.W.2d at 609; *Price v. State,* 410 S.W.2d 778, 780 (Tex.Crim.App.1967); *Turner v. State,* 720 S.W.2d at 164; *see also* TEX.PENAL CODE ANN. § 15.02(b) (Vernon 1974). In addition to the necessary agreement, the State must also prove that one of the members of the conspiracy performed an overt act in pursuance of the agreement. TEX. PENAL CODE ANN. § 15.02(a)(2) (Vernon 1974). The required overt act need not, in itself, be a criminal act. *McCann v. State,* 606 S.W.2d at 898 n. 1.

The evidence in the present case, viewed in the light most favorable to the conspiracy verdict, shows that Carr had made various offers to sell the CEP building to the school district since 1982. After the board agreed to consider Carr's offer in 1985, Carr and Minton met with superintendent Bustamonte. Carr asked whether Bustamonte was going to oppose the purchase, and stated that one of the members opposed to it was not going to be present for the vote. Minton relayed a message from Ramirez and another board member that they had the votes to make the purchase and Bustamonte should not oppose it. At the time of the vote, four members of the seven member board were opposed to the purchase, the superintendent of the school district was opposed to the purchase, and an architect hired by the district to conduct a feasibility study had concluded that the building was not suitable for the proposed use. The motion to purchase the building was passed by a vote of three to two because two of the members who opposed it were not present at the meeting. Ramirez was one of the members who voted in favor of the purchase.

Approximately two weeks after Carr received the second check in payment for the CEP building, he began to write a series of checks to Ramirez. The total of these checks exceeded $11,000. Ramirez, Carr, and Minton all claimed that these checks were contributions to Minton's campaign, but the reports filed by Minton do not reflect any such contributions from Carr, and Minton's final campaign report was never filed. Minton told the grand jury that his campaign received $11,200 from Carr. He later wrote a letter to the grand jury stating that this figure was supplied by Ramirez, and that he only had personal knowledge of directly and physically receiving $600. The State construes this letter as recanting his prior testimony and calling

into question his veracity concerning this transaction. The State contends that the evidence, as recited above, is sufficient to show that appellants had agreed among themselves to commit bribery and that they performed a number of overt acts in pursuance of that conspiracy.

While this evidence may establish a strong suspicion or probability that appellants conspired to commit bribery, it is not sufficient to support the convictions because it does not negate the reasonable hypothesis of innocence raised by appellants. *See Carlsen v. State*, 654 S.W.2d at 449–50; *Freeman v. State*, 654 S.W.2d at 456–57; *Denby v. State*, 654 S.W.2d at 464. This hypothesis is supported by the following evidence:

*A. The vote.* Bustamonte testified that there was nothing unusual about the meeting with Carr and Minton, and that they did not try to bribe or pressure him to support the purchase. While two members who were opposed to the purchase of the CEP building were not present for the vote, they were properly notified of the meeting and were not tricked or coerced into failing to attend. No one protested the setting of the meeting and no one sought to set the matter for reconsideration after the vote was taken. There was conflicting testimony regarding whether the decision to purchase the building was a good or bad one, but there was ample evidence to support the hypothesis that Ramirez voted in favor of it because he believed it to be good for the school district.

*B. The timing of Carr's checks to Ramirez.* There is evidence that the first of these checks was written two weeks after Carr received the final proceeds from the sale. This date was over six months after the school board vote, and five months after the first payment from the school district, from which Carr received approximately $36,000. The date of this first check to Ramirez was also one month after Minton filed for reelection. The State points out that no more checks were written after the grand jury began its investigation, but the evidence also shows that the last check was written one week after the run-off election and that it was not unusual to receive campaign contributions after the election to pay any debts left over from the campaign.

*C. Disposition of the funds.* Appellants produced a number of witnesses who testified that, although Ramirez was not named as Minton's campaign treasurer,[1] it was common knowledge in the community that Ramirez was in charge of receiving campaign contributions from Carr for Minton's campaign. One member of the board who had voted against the purchase testified that he, at one time, suggested that Ramirez receive these funds. Another board member testified that she saw Ramirez bring a check from Carr to Minton's workers, and that Ramirez cashed that check to pay the workers. A variety of witnesses testified that Minton's campaign workers were paid every Friday in cash, and that they received this cash from Ramirez. The owner of a print shop testified that he did all of the printing for Minton's campaign and that he was paid in cash by Ramirez. A restaurant owner testified that Minton frequently came to his restaurant with groups of people during the campaign, and that the restaurant was paid in cash by Ramirez. None of these witnesses could produce complete records or receipts, but they stated that it was not unusual in the area to be paid in cash for campaign services.

Of the series of checks written to Ramirez by Carr, the State conceded that one actually did go to pay Minton's campaign expenses. There was evidence that Ramirez was out of town one week and that he asked his wife to pick up a check at Carr's office. She received the check and contacted a sheriff's deputy to pick it up from her. After picking up the check, this deputy called Minton, who instructed his wife to go get the check. The check was then endorsed and cashed by Minton's son, who gave the proceeds to Minton, who paid his campaign workers. At least two campaign workers testified that, while they were usually paid by Ramirez on Friday,

---

1. *Minton's* campaign reports do not reflect that     anyone was named as his official treasurer.

one week they were paid by Minton on a Saturday because Ramirez was out of town.

*D. Failure to report Carr's contributions.* There is evidence that the reporting of political contributions was very lax in Maverick County during this period of time. While we do not condone any failure to abide by the election laws, this evidence still supports the hypothesis that Minton failed to report Carr's contributions out of negligence. The hypothesis that receives even stronger support in the record, though, is that Minton failed to file his final campaign report because he was intimidated by the grand jury. There is evidence that, at the time he testified before the grand jury, the grand jury informed him that they were waiting for his report to "tie the deal up" and that he was not involved but that he could "deal himself in" to a coverup. He was asked whether he was going to provide an alibi for Carr and Ramirez by declaring the money as contributions, and whether he was going to "take the fall" for them.

The clear implication of these statements was that if Minton filed his final report and listed campaign contributions from Carr, the grand jury intended to indict him for conspiracy. That Minton failed to file this report because he was intimidated by these threats is as reasonable a hypothesis as that presented by the State—that he was covering up a bribe. Regarding Minton's alleged recanting of his grand jury testimony, it is apparent from a reading of that testimony and his subsequent letter to the grand jury that Minton was trying to distinguish between money received by his campaign and money he personally, physically received. He stated that the former was $11,200, and that that figure was given to him by Ramirez, and that the latter was $600. His oral testimony and the letter are not necessarily at odds with one another, as one simply attempts to clarify the other.

As noted above, while the evidence may support a strong suspicion that appellants conspired to commit bribery, it does not negate the reasonable hypothesis that Carr was simply contributing to Minton's campaign, that Ramirez was merely a conduit for this purpose, and that the money had no connection to Ramirez' vote for the purchase of the CEP building.

We feel constrained to add that we are uncomfortable with the reasonable hypothesis test, which is the sole basis for this reversal of the jury's guilty verdict. That test requires the appellate court to reverse if the evidence supports a reasonable hypothesis inconsistent with guilt, even though the jury impliedly found that the hypothesis was unreasonable. In effect the test requires us to substitute our judgment for that of the jury. It requires us to credit—for reasonable doubt purposes— testimony that the jury may well have thought was nonsense.

That is exactly what has happened in this case because the jury was expressly instructed to acquit each defendant unless it found beyond a reasonable doubt that the payments were intended as bribes *and were not intended to be campaign contributions to Minton.*

Perhaps the most common application of the test occurs when the issue is whether the evidence is sufficient to *connect the defendant to a crime. See, e.g., Skelton v. State,* 795 S.W.2d 162 (Tex.Crim.App.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990); *Carlsen v. State,* 654 S.W.2d 444 (Tex.Crim.App.1983); *Freeman v. State,* 654 S.W.2d 450 (Tex.Crim. App.1983); *Wilson v. State,* 654 S.W.2d 465 (Tex.Crim.App.1983); *Moore v. State,* 640 S.W.2d 300 (Tex.Crim.App.1982). Other cases have involved defendants who were caught with drugs in their presence, and the issue was whether the evidence proved *knowing possession. See, e.g., Humason v. State,* 728 S.W.2d 363 (Tex.Crim. App.1987); *Dickey v. State,* 693 S.W.2d 386 (Tex.Crim.App.1984). Perhaps the test should be limited to these two categories.

We seriously question whether the test should apply on the issue of the defendant's *state of mind* in a case like this one. But there are indications that the test is also appropriate in conspiracy cases, *see, e.g., Roberts v. State,* 375 S.W.2d 303, 304

(Tex.Crim.App.1964); *Feldman v. State,* 141 Tex.Crim. 306, 147 S.W.2d 773, 776 (1940), although we have not found any Texas cases reversing conspiracy convictions on this basis.

There is much to be said for Justice Butts' suggestion that the test does not apply when the jury was expressly instructed about the alternative theory consistent with innocence, but the appellate test has been applied when the jury was expressly instructed about circumstantial evidence, although there is no indication in the opinions that the instruction was as explicit as the instructions given in the present case. *See, e.g., Andrews v. State,* 744 S.W.2d 40 (Tex.Crim.App.1987), *cert. denied,* 488 U.S. 871, 109 S.Ct. 182, 102 L.Ed.2d 151 (1988); *Denby v. State,* 654 S.W.2d 457 (Tex.Crim.App.1983).

In this case the campaign contribution hypothesis was the basis for the defendants' defense in the trial of this case. It is supported by ample evidence; it was not dreamed up by this court. A fair and good-faith application of the reasonable hypothesis test requires a reversal and an entry of an acquittal in this case.

For the reasons stated, the judgments are reversed and an order of acquittal is entered in each case. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

CHAPA, Justice, concurring.

I concur in the results and most of the reasoning of the majority. However, I find no discomfort with the reasonable hypothesis test.

It is clear that in circumstantial evidence cases, appellate review requires that we consider whether the circumstances exclude every other reasonable hypothesis except that of the guilt of the accused. *Butler v. State,* 769 S.W.2d at 238 n. 1 (Tex. Crim.App.1989) (en banc); *Humason v. State,* 728 S.W.2d 363 (Tex.Crim.App.1987) (en banc). Direct evidence has much more potential for proving the guilt of an accused *beyond a reasonable doubt* than circumstantial evidence. It is therefore reasonable that the Texas Court of Criminal Appeals establish this additional "guideline for assaying whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" in circumstantial evidence cases. *Anderson v. State,* 701 S.W.2d 868 (Tex. Crim.App.1985), *cert. denied,* 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 163 (1986). In so doing, the Texas Court of Criminal Appeals merely assured the constitutional protection afforded every accused that he not be convicted unless the state *proves its case beyond a reasonable doubt.*

I particularly disagree that the hypothesis test should not apply on the issue of the defendant's *state of mind,* for in such cases, unless the accused admits his state of mind, it is only through circumstantial evidence that the state can prove it. Without the test, it would be easy to ignore the accused's presumption of innocence as to his state of mind, when it is a necessary element of the offense.

BUTTS, Justice, dissenting.

I respectfully dissent. The indictments in these cases alleged, in summary, that the three appellants conspired, beginning about July 10, 1985, and continuing through July 30, 1986, that they would engage in conduct with the end result that Carr would give Ramirez $11,500.00 in consideration for his calling a special meeting as president of the Board of Trustees of the Eagle Pass Independent School District, and for his vote and recommendation to the board members present to consummate the purchase of the CEP building. Certain overt acts were alleged: 1. Ramirez called a school board meeting on July 30, 1985, with the purpose of voting for the purchase of the CEP building. 2. Carr gave Ramirez the sum of $1,500.00 on February 3, 1986, on March 24, 1986, and on April 9, 1986. Carr gave Ramirez the sum of $1,000.00 on April 17, 1986, on April 30, 1986, and on May 9, 1986. On June 6, 1986, Carr gave Ramirez the sum of $1,500.00, and on June 13, 1986, the sum of $1,000.00.

Other overt acts alleged were: On July 10, 1985, Minton and Carr went to the office of the Superintendent of the Eagle Pass Independent School District. Minton informed the Superintendent they had the majority of votes needed in favor of the purchase of Carr's building and for the Superintendent not to oppose the purchase. On July 30, 1986, Minton stated to the grand jury that he had received from Carr through Ramirez $11,200.00 as campaign contributions.

Minton was a Maverick County Commissioner at the time of the alleged offense. Ramirez was the president of the Board of Trustees of the school district. Carr was the owner of the CEP building.

The standard for review in a circumstantial evidence case is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Carlsen v. State,* 654 S.W.2d 444, 449 (Tex.Crim.App.1983). This standard was announced in *Jackson v. Virginia,* 443 U.S. 307, 319–319, 99 S.Ct. 2781, 2788–2789, 61 L.Ed.2d 560 (1979), which heeded due process requirements of proof beyond a reasonable doubt as previously mandated by *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

In its Opinion on Rehearing, the *Carlsen* court quoted from *Jackson v. Virginia:*

[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' (citation omitted) Instead, *the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.* (citation omitted) This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in

the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law....

*Carlsen v. State,* 654 S.W.2d at 448–449 (citations omitted). Noting that the "exclusion of outstanding hypotheses" analysis would still apply in circumstantial evidence cases when the *Jackson v. Virginia* standard of review was employed, the Court further elaborated:

By the nature of circumstantial evidence, in order to determine it rationally establishes guilt beyond a reasonable doubt, a process of elimination must be used.

It is clear, however, that the application of the "exclusion of outstanding reasonable hypotheses" analysis is not an element of the standard of review required.

The task of the reviewing court is not to ask whether we believe that the evidence at trial established guilt beyond a reasonable doubt; it is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier could have found the essential elements of the crime beyond a reasonable doubt. *Girard v. State,* 631 S.W.2d 162, 163 (Tex.Crim.App. 1982). It is required that this court examine *all of the evidence.* We should not simply focus on only part of the evidence, that is, the evidence which supports the hypothesis.

### The Defense's Theory

The defensive theory in the present case was that Ramirez received money from Carr and gave the cash from those checks, as campaign contributions, to Minton, who was running for his office of County Commissioner. Evidence showed that Ramirez received the checks from Carr which were

made out to Ramirez for a period of several months.

Minton first testified before the grand jury, however, that he received only $600.00 from Carr. He subsequently gave the grand jury a conflicting written statement that he had received campaign contributions in the sum of $11,200.00 from Carr, according to figures supplied to him by Ramirez, but he had no personal knowledge of this at the time he had given the $600.00 figure. There were no records made of the Carr money Minton said he received. It is also undisputed that Minton did not file a sworn statement of campaign contributions in compliance with the election laws which would show the source, the dates, and the amounts received.

### What the Jury Could Consider As Evidence of The Agreement

In evidence was the testimony of the Superintendent of the school district that *Minton and Carr* came to him to tell him the votes needed to purchase the CEP building were already committed and to advise the Superintendent, who they knew opposed the purchase, not to take any position at that time opposing the purchase. It is significant that Minton, as County Commissioner, had no official duty regarding purchase of school real property in Eagle Pass. Also in evidence was the testimony of other witnesses that the CEP building had never, and did not on July 30, 1985, meet the requirements of the school system and, further, that the purchase of the CEP building had been repeatedly rejected by the school board at other meetings during the past several years. There was evidence that other members of the School Board, who were not present at the called meeting due to other previously scheduled events, were opposed to purchasing the property. Thus, it was assured before the meeting, which was specially called by *Ramirez* to convene during the absence of opposition board members, that there would be no opposition to the purchase of the building. Only three votes of a possible seven-vote school board carried the purchase.

### The State's Theory

The State's theory was that the agreement between the three principals was entered into prior to Minton and Carr going to see the Superintendent to be assured he would not oppose the purchase at the school board meeting. Further, the theory was that Ramirez' unofficial "treasurer" post in Minton's campaign afforded the optimal position for him to pretend to funnel the money into the political campaign when, in actuality, the money would go to Ramirez as consideration for his vote and calling the meeting. Thus, a "cover-up," campaign contributions, existed in the event the necessity to have one arose.

It is readily apparent how "campaign contributions" became the focal point of the trial, and much of the evidence concerned this subject. In its charge to the jury, the court defined "benefit" and specifically included this admonition: "but does not include a contribution made and reported in accordance with law." "Campaign contribution" was defined as a contribution to a candidate or political committee that is offered or given with the intent that it be used in connection with a campaign for elective office or on a measure.

Bribery was defined:

A person commits bribery if he intentionally or knowingly offers, confers, or agrees to confer on another, or solicits, accepts, or agrees to accept from another: any benefit as consideration for the recipients's decision, opinion, recommendation, vote or other exercise of discretion as a public servant, party official, or voter.

The jury was instructed it could not consider the testimony that Minton had failed to file his contribution report for any purpose unless it believed that conduct beyond a reasonable doubt and then only for the limited purpose of determining the *intent* of Minton, if any, to commit the offense of conspiracy as alleged.

The jury was instructed that in order to find Carr guilty of conspiracy to commit bribery, it must find beyond any reasonable doubt that Ramirez was the intended recipi-

ent of a benefit, and that such benefit was not intended as a campaign contribution to Minton. It was instructed that a campaign contribution is not a benefit. It was stated that in order to constitute a bribe, a specific official act must be the object of a benefit. The jury was told if it was not convinced beyond any reasonable doubt that Ramirez was the intended recipient of a benefit, and that such benefit was not intended to operate as a campaign contribution to Minton, then the jury must find him not guilty. Another similar instruction was also submitted, which required a verdict of not guilty unless these same matters were found beyond any reasonable doubt.

The same kind of instructions were given as to all the appellants. Next the jury was instructed on bribery, specifically that the law requires that one confer or accept a "benefit" as consideration for the recipient's vote. "That law, however, expressly excepts a 'political contribution' from the statutory definition of 'benefit'...." The jury was instructed that it must be convinced beyond any reasonable doubt that Carr did not intend the same to be a political contribution to Minton. Otherwise, the jury must return a not guilty verdict.

The hypothesis of the appellants was fully explored by the factfinder at trial. It was not raised on appeal for the first time. In *Anderson v. State*, 701 S.W.2d 868 (Tex. Crim.App.1985), *cert. denied*, 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 163 (1986), a circumstantial evidence case, that defendant argued there were outstanding reasonable hypotheses (that a murder was committed when the deceased became hysterical and threatened the defendant, and that the evidence supported a drug transaction as well as a robbery, thereby establishing a hypothesis other than that of the defendant's guilt). The *Anderson* court explained:

Appellant confuses the standard for review in a circumstantial evidence case with the manner of its application. An alternate hypothesis of guilt is not a standard by which evidence sufficiency is measured: it is a 'guideline for assaying whether a rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt.' *Carlsen, supra* at 450. Thus, simply because appellant presented a different version of the events, the evidence is not rendered insufficient.

It was also noted that the jury was the ultimate trier of fact. As such, it had the duty of resolving conflicting testimony and the option of accepting or rejecting the defendant's evidence. Simply because the jury found the defendant's evidence unconvincing is not grounds for finding insufficient evidence to support the verdict. *Anderson v. State*, 701 S.W.2d at 872–73.

There was evidence in this case which raised the alternate hypothesis of campaign contributions. The defensive theory of the alternate hypothesis, which required the jury to make specific findings of fact, was squarely and properly presented to the jury as factfinder. By its finding of guilt, the jury affirmatively rejected the alternate hypothesis of campaign contributions. It cannot be concluded by the appellate court that the jury did not determine that issue. The instructions were copious on the alternate hypothesis. There was evidence presented of the alleged agreement and overt acts, and the jury was thoroughly instructed on the law as it applied to campaign contributions. The inescapable conclusion is that the jury found these sums of money were not campaign contributions.

In *Acevedo v. State*, 633 S.W.2d 856 (Tex.Crim.App.1982) the court cited *Griffin v. State*, 614 S.W.2d 155, 159 (Tex.Crim. App.1981):

[T]he critical inquiry on review of sufficiency of the evidence to support a criminal conviction must not be simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' (citations omitted) Instead, the relevant question is whether, after viewing the

evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Acevedo v. State,* 633 S.W.2d at 857. It is only when no rational trier of fact could have found guilt beyond a reasonable doubt that a conviction cannot constitutionally stand. Applying this standard to the case before us, this court should hold the evidence was sufficient to support the convictions. The majority opinion focuses on the evidence which it believes to be convincing and ignores the evidence which proved to the factfinder at trial the elements of the offense of conspiracy.

On hearing the evidence, the jury could conclude that Minton, who as a candidate, under the law, must report all contributions, faced a dilemma when he appeared before the grand jury. He faced only a civil sanction for failure to report a contribution, whereas, he faced a criminal perjury charge if he submitted a false sworn campaign contributions report that he actually received the money from all the checks as campaign contributions. The jury implicitly found that he made the choice not to file a sworn campaign contributions report because of the possible criminal consequences, and that deliberate choice signified the sworn account would be false. Under those circumstances and the instructions it received, the jury could find the requisite intent to commit the offense of conspiracy on the part of Minton. Further, the jury implicitly found, based on the evidence, that the cash from the Ramirez checks never became campaign contributions.

The jury could find that Minton had no suitable official reason in accompanying Carr and that his only purpose was to forewarn the superintendent about the guaranteed sale and to be assured that the Superintendent refrained from bringing his adverse opinions to the attention of the voting board members. The jury had reason to question why a county commissioner was inappropriately involved in the purchase of the building. The jury could thus find that Minton was carrying out his part of the agreement, which was to guarantee

that the Superintendent, an influential official, abstained from active opposition to the purchase of the CEP building.

This court cannot become the "thirteenth juror" and substitute its finding for that of the jury. We are prohibited from becoming factfinders by two statutes: TEX. CODE CRIM.PROC.ANN. art. 36.13 (Vernon 1981) and art. 38.04 (Vernon 1979). The jurors are the exclusive triers of the facts and judges of the credibility of the witnesses. The jury had the duty of resolving conflicting testimony and the option of accepting or rejecting appellants' evidence. Simply because the jury found appellants' evidence unconvincing is not grounds for finding insufficient evidence to support the verdict. *See Little v. State,* 758 S.W.2d 551, 563 (Tex.Crim.App.1988) citing *Anderson v. State, supra.* When a question is raised concerning the sufficiency of the evidence, we are obligated to view all the evidence in the light most favorable to the jury's verdict. The majority opinion fails to apply this standard and, as a result, utilizes the reasonable hypothesis standard of review incorrectly. It *finds* the hypothesis offered as the defensive theory was proved and that the State did not disprove it. However, the jury as factfinder rejected the testimony and evidence concerning the alternate hypothesis, as was its prerogative, and did find that the State proved all of the elements of the offense, thereby negating the hypothesis.

The pivotal point in this case is that the jury was given thorough and detailed instructions on "campaign contributions" by the trial court. The jury in this case was therefore literally required to resolve the conflicting facts surrounding the State's case and the alternate hypothesis presented by the defense. That unusual circumstance must be given consideration in our appellate review. We cannot now become the factfinder.

I would conclude that after viewing the evidence in the light most favorable to the jury verdict, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. The evidence

supports a finding of guilt beyond a reasonable doubt.

For these reasons, I respectfully dissent. The jury's verdict should be affirmed.