**A.I. O'KEEFE, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**A.I. O'KEEFE, Sr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 67894, 67895.**

Court of Criminal Appeals of Texas, En Banc.

March 27, 1985.

S.W.2d 445 (Tex.Cr.App.1974).

Stu Stewart, Houston, for appellant.

Charles J. Sebesta, Jr., Dist. Atty., Caldwell (Gerald M. Brown, Temple, of counsel), Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

In a joint trial, appellants were convicted of arson and both were sentenced to ten years' confinement and a $10,000 fine, probated.

During the evening of July 7, 1979, appellants were seen driving away from their weekend home in Brenham around 8:00 p.m. Neighbors testified that appellants left the house in separate cars and drove at a normal rate of speed. Some five to ten minutes after appellants' departure, neighbors noticed smoke coming from the three story house. Within minutes flames could be seen in the northeast first floor section of the house. By the time the first firefighters reached the scene at approximately 8:20 p.m., the house was fully involved, with fire on all floors. One fireman testified that the most intense part of the fire was in the central part of the house while the Brenham fire marshall testified that when he arrived around 8:25 p.m., the most intense fire was on the northeast side of the bottom floor.

The State's expert testimony came from Don Hicks, the manager of the special investigations division of CGS Development Laboratories (a forensic engineering company) and from Dr. Andrew Armstrong, an associate professor of chemistry at the University of Texas at Arlington. Hicks testified that his company was hired to investigate the fire by the American General Insurance Company. He went to the fire scene on the afternoon of July 11, 1979, and made a fire scene examination. After walking around the house, he took three samples from areas with low burn patterns and heavy fire damage. He then went to the Brenham fire department and interviewed several individuals who were present at the fire, including the fire chief and the fire marshall. As a result of these interviews, Hicks went back to the fire scene and closely examined the northeast portion of the building. Hicks testified that this examination revealed a definite flammable pour pattern on the floor in the northeast corner of the house. Hicks took a sample from this corner and forwarded all four samples to Dr. Armstrong for chemical analysis. Hicks also testified that he found evidence of low burning and a trailer effect around the south porch and

kitchen doorway, indicating that an accelerant was poured in the area. Finally, Hicks testified that in his expert opinion the fire was the result of the deliberate act of an arsonist who used gasoline as an accelerant. On cross-examination, Hicks admitted that because of the large amount of debris covering the entire area of the house, he did not do a detailed examination of the house. He also admitted that three of the samples taken from areas where he saw burn patterns tested out negative as to the presence of an accelerant. Although he knew the house had wood floors and wood shingles on the roof, Hicks had no knowledge as to the type of interior wall coverings nor did he take into consideration in his investigation any of the furnishings of the house. Finally, he testified that he believed the fire began in the center portion of the house.

Dr. Andrew Armstrong testified that he specialized in arson investigation. On July 14, 1979, he received four samples taken from the fire scene by Don Hicks. After testing each sample with a gas chromatograph, Armstrong found that the first sample contained some components which could be associated with gasoline, but they were insufficient for absolute identification. Samples two and three were negative and he found that the fourth sample taken from the northeast portion of the building showed a positive residue of gasoline. Furthermore, the fact that this residue was thermally stressed showed that it had been put on the area before the fire.

William Thompson, an arson investigator with the State Fire Marshall's office testified that he executed a search warrant on the premises in December, 1979, some five months after the fire. He searched for and found three burn patterns, indicating that some type of liquid had been poured on those three locations.

Further evidence showed that the house was purchased by the O'Keefe family some fourteen years prior to the fire and in May of 1978, A.I. O'Keefe, Sr. and his wife transferred ownership of the property to Industrial Plant Services, Inc., the family business, although they still maintained the home as a residence. Furthermore, on January 22, 1979, a loan had been taken out on the house in the amount of $50,000.

Paul Peterson, the property claims supervisor for American General Insurance Company, testified that he was handling the insurance claims filed by the O'Keefe family. Two policies were outstanding on the house. The household contents or unscheduled personal property was insured for $95,500. This policy was in the name of A.I. O'Keefe, Sr. and his wife. The second policy was in the name of Industrial Plant Services and insured the dwelling for $228,-000. Proofs of loss and claims were filed on both policies.

The defense presented evidence that during the fire at least one fireman saw a blue flame burning on the first floor. George Cordemeyer, the Brenham fire chief, testified that when he arrived at the fire around 8:15 p.m. the highest area of intensity was on the northeast third floor. Shortly after he arrived Cordemeyer assisted in turning the natural gas supply off where it entered the north side of the house.

The defense presented expert testimony showing that the cause of the fire was either due to a natural gas leak or a cigarette igniting papers and spreading to a plastic container of gasoline that had been left in the house. George Green, a forensic engineer, testified that he had been hired by the defense to investigate the fire and had spent December 7 and 8, 1979, examining the fire scene. He believed the fire started in the east side of the house, possibly in the dining room/parlor area. This was indicated by the fact that the area was burned heavily through the floor, thus showing the longest duration of burning. Green testified that it was possible the fire had originated under the floor. This was evidenced from the fact that there was heavy deep charring underneath the floor. Green testified that the house did not have any sheetrock and the walls in the dining room area had a burly pine wainscot paneling that had been heavily treated with linseed oil.

Green presented two explanations for the quick spread of the fire. First, he found evidence of a gas leak in piping underneath the east side of the house. This would account for the blue flame which the firemen saw near the stairway. The natural path for the fire to travel upward to the second and third floors was through the empty area between the wall and chimney on the east side of the house. Green's second explanation took into account that A.I. O'Keefe, Sr. said he had been using gasoline to clean a piece of furniture in the dining room. O'Keefe, a heavy smoker, had the gasoline in a plastic gallon container and the container was sitting on a pile of papers. Green theorized that after the appellants left the house, an abandoned cigarette may have caught the papers on fire. The accompanying heat eventually ruptured the container of gasoline, throwing the gasoline throughout a large area. The burly pine paneling quickly caught fire and flames spread rapidly.

Green refuted Hick's testimony in several areas. First, he testified that he found no evidence of puddling or pouring on the steps or porch, nor was there any evidence of puddling or pouring in the kitchen. The kitchen floor was made of an epoxy resin material that was highly combustible and this might account for what Hicks thought were pour patterns. In addition, examination of the natural gas pipes close to the furnace showed that there was a gas leakage. Green also testified that the patterns Hicks identified as pour patterns in the center part of the house were caused by the rupture of the container of gasoline. Green found no evidence of puddling but did find an indication of a long-listed burn-through which would be caused by the burning of heavy pieces of furniture. Green attributed the rapid spread of the fire to the drift of the natural gas through the space between the walls of the dwelling. Finally, Green testified that during his examination of the fire scene, he found evidence that a large number of valuables and personal items had been consumed in the fire. He stated that in an arson case where the fire was started to collect insurance proceeds, it was highly unusual that such valuables would not have been removed from the building. He concluded his testimony by stating that he found no evidence that the fire was intentionally set.

The defense also introduced the testimony of Joe Perino, a fire protection consultant. Perino testified that he examined the fire scene in January, 1980, and concluded that the fire originated on the east wall of the dwelling between the fireplace and the outside heating and air conditioning unit. He testified that the fire started underneath the floor as a result of a natural gas leak. He found no evidence of any accelerant being poured on either the back porch or the steps. He found no evidence of any puddling, finger effects or trailer, all of which would have been present had an accelerant been used to intentionally set the fire.

Several witnesses testified that the appellants' reaction to the fire was one of shock and disbelief. A.I. O'Keefe, Jr. testified that he and his father left the house the night of the fire to go to the car wash. While they were at the car wash, they were informed that a house in their neighborhood was burning. They immediately returned home and found the house engulfed in flames. Immediately before they had left the house, his father had been using gasoline to clean a piece of furniture in the dining room. O'Keefe testified that although business for the family company, Industrial Plant Services, was slow at the time of the fire, the company was not at its lowest financial point and had from $60,000 to $65,000 cash available. He had $17,000 available to himself personally.

Finally, A.I. O'Keefe, Sr. took the stand and testified that he did not intentionally burn the house down.

Both appellants were indicted under V.T. C.A., Penal Code, Section 28.02(a)(2) (1974) which provided at the time:

"(a) A person commits an offense if he starts a fire or causes an explosion:

\* \* \* \* \* \*

"(2) with intent to destroy or damage any building or habitation to collect insurance for the damage or destruction."

### Cause No. 67,895
### A.I. O'Keefe, Sr.

■ In his first ground of error, appellant contends the evidence is insufficient in that there was no evidence of his intent to collect insurance proceeds. In his third ground of error, he argues that the evidence is insufficient in that not every reasonable hypothesis except that of arson was negated. We find after reviewing the evidence that we must sustain both of appellant's contentions as to the sufficiency of the evidence. Viewing the evidence in the light most favorable to the verdict as we are required to do by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), we find there is no evidence to show any intent to collect insurance. The evidence as to insurance produced by the State shows only that the house and its contents were covered by two insurance policies—one in the name of the appellant and his wife and the other in the name of Industrial Plant Services, Inc.—and, that after the fire, claims were made on each policy.

The record fails to include any evidence which might suggest that the policies were taken out shortly before the fire or increased in value shortly before the fire so as to give support to an inference of some criminal intent on the part of the appellant. Compare *Miller v. State*, 566 S.W.2d 614 (Tex.Cr.App.1978) (where evidence showed an insurance policy had been renewed and coverage increased some two months prior to fire). In short, there is nothing in the record to support a finding by "a rational trier of fact" that appellant set the fire *with the intent to collect insurance proceeds.*

■ Likewise the evidence adduced by the State did not negate every reasonable hypothesis as to the cause of the fire. In *Denby v. State*, 654 S.W.2d 457, at 464 (Tex.Cr.App.1983) (Opinion on Rehearing),

this Court noted that "if the evidence supports an inference other than the guilt of the appellant, a finding of guilt beyond a reasonable doubt is not a rational finding." Not only does the evidence in the instant case suggest at least two other reasonable hypotheses besides arson, there is nothing in the record connecting the appellant with the act of arson. The mere fact that it was appellant's residence and he was seen leaving the scene shortly before the fire was discovered is not sufficient to show that he set the fire.

The State relies on *Miller v. State*, 566 S.W.2d 614 (Tex.Cr.App.1978), in support of their argument that the evidence is sufficient. Although the instant case has many similarities to *Miller*, we find it to be distinguishable on one key point: the evidence showing that the defendant actually started the fire. In that case, the defendant was shown to have been present shortly before the fire was discovered. He was trying to notify potential customers and his employees that his restaurant would be closed that day. He was seen leaving the scene in a hurried manner and most importantly, he tried to cover up his prior presence on the day of the fire. In the instant case, although appellant was seen leaving the scene shortly before the fire was discovered, none of the other incriminating facts found in *Miller* are present. Compare *Burrow v. State*, 481 S.W.2d 895 (Tex.Cr.App.1972) (where evidence showed that the defendant was seen leaving the scene of the fire shortly after it had been set, after the fire the defendant was seen with singed hair and eyebrows, and prior to the fire defendant had threatened to either blow the house up or burn it down); *Smith v. State*, 450 S.W.2d 92 (Tex.Cr.App.1970) (where after natural gas explosion in the house, among other things, defendant was found lying on floor in house along with burned candle, matches, gas heater was turned on but not lighted, old clothes and paper had been soaked in a substance smelling like kerosene, and insurance policy covering house and contents was found lying on a table in the living room).

We find the evidence insufficient to support the appellant's conviction in Cause No. 67,895.

### Cause No. 67,894
### A.I. O'Keefe, Jr.

 In his first ground of error, appellant contends the evidence is insufficient to show that he started a fire with intent to collect insurance. A review of the evidence adduced at trial leads us to find that there is nothing in the record to show that appellant had the requisite intent regarding collecting insurance. Because there is no evidence to show that appellant had any right to the insurance proceeds or was in any way connected to the insurance policies, it was encumbent upon the State to show that he knew of the insurance and that he set the house on fire at the instigation of the owner. *Moore v. State*, 66 Tex.Cr.R. 169, 146 S.W. 183 (Tex.Cr.App.1912). Although it may be inferred that appellant knew of the insurance policies, we find no evidence whatsoever that he set the house on fire at the instigation of the owner. The mere fact that appellant was at the scene shortly before the fire was discovered does not support the State's burden.

Appellant also contests the sufficiency of the evidence in two more grounds of error. First, he maintains that the evidence is insufficient in that not every reasonable hypothesis except that of arson was negated and second, he argues that the evidence was insufficient to show that he was a party to the offense. As we noted above in his father's case, the evidence is insufficient to show that the fire was incendiary in origin. Furthermore, because we have found the evidence lacking in proving that appellant's father actually started the fire and there was nothing additional adduced at trial which incriminates appellant, we are compelled to also find that the evidence is insufficient to sustain appellant's conviction as a party to the offense.

Because of our finding in each cause that the evidence is insufficient to sustain the verdict of the jury, and because of *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), we must not only reverse the appellants' convictions, but must direct the trial court to enter a judgment of acquittal in each cause.

W.C. DAVIS, J., dissents.

TEAGUE, J., not participating.