**Kaufman WILLIAMS, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 12–90–00143–CR.**

Court of Appeals of Texas, Tyler.

Feb. 28, 1991.

Rehearing Denied April 24, 1992.

Discretionary Review Refused Sept. 30, 1992.

Rehearing Denied Nov. 4, 1992.

---

John H. Seale, Jasper, for appellant.

Charles Mitchell, San Augustine, for appellee.

COLLEY, Justice.

Appellant Kaufman Williams, Jr., was convicted by a jury of the murder[1] of his wife, Elaine Williams. The jury assessed his punishment at confinement for fifty years and a $10,000 fine. We will affirm his conviction and punishment.

The record reveals that, during the early morning hours of May 15, 1989, fire virtually consumed a building owned by appellant in Yellow Pine, Texas. The building consisted of a grocery store, two storage rooms and living quarters. Appellant, his wife, Elaine Williams ("the victim"), and Williams' teenage step-daughter, Michelle Reynolds ("Michelle"), who also died in the fire, resided in those quarters. It is undisputed that the fire started near the front (west side) of the building shortly after 5:00 a.m. on Monday, May 15, 1989, and that appellant, Elaine and Michelle had gone to bed in the living quarters at approximately 10:00 p.m. the night before. According to appellant's testimony, he was awakened by "popping" and "cracking" noises coming from the store. Appellant stated that after arming himself, he went into the store area to investigate the noises. He testified that he saw a fire near the front door of the store and then went back into the living quarters and shouted to his wife and step-daughter, calling them by name and saying, "the store [is] on fire. Get up, the [store] is on fire." According to his testimony, appellant, thinking that the fire was electrically ignited, went through a back door located on the east side of the building, headed toward the south end of the building and opened the electrical switches housed in what he called "a disconnect box." Appellant further testified that, while he was at the south end of the building, he encountered Joe Wayne

Jacks, "a [newspaper] carrier" who had stopped to stock the store's vending machines. Appellant testified that, after a brief conversation with Jacks, he went back around to the rear of the building near the back door, expecting to find the victim and Michelle outside the building. He stated that when he saw that they were not there, he "tried to go back in the store and ... got to the second door[2] and ... couldn't go any further. The smoke almost choked me and I stumbled back out the back door." Appellant then testified that he went around to a barred[3] window in the kitchen area of the living quarters and attempted to remove the bars, after first breaking the glass out of the window. His attempt was unsuccessful, and after fire fighters at the scene extinguished the fire, the partially clothed bodies of the victim and Michelle were found in the living quarters near the door located on the south side of those quarters. It is undisputed that the cause of death of the victims was carbon monoxide poisoning resulting from smoke inhalation.

Appellant alleges ten points of error. Under his first three points of error, he claims the evidence is insufficient to support the guilty verdict. By his fourth and fifth points of error, he complains of the State's arguments at both the guilt-innocence and punishment phases of the trial. Under points of error six through ten, he asserts that the trial court erred in overruling his motion for new trial because: (6) the court admitted, over his proper hearsay objection, the testimony of State witness, Eleanor Stewart, stating "what action she took following a conversation with [the victim]...."; (7) the court erred in overruling his objection to certain questions propounded to appellant by the prosecutor on cross-examination; (8) the court erred in overruling his pre-trial motions to take the deposition of State's expert witness, Donald Turk; (9) the prosecutor and Deputy Sher-

---

1. (Pursuant to TEX.PENAL CODE ANN. § 19.-02(a)(1) (hereinafter section 19.02)).

2. According to the diagrams of the building introduced into evidence, this "second door" is apparently located at the south end of the living quarters portion of the building. (A copy of

State's Exhibit No. 4 is attached to this opinion as Appendix "A".)

3. It is undisputed that all of the windows on the north side of the living quarters had "burglar [iron] bars" on them.

**452**

iff Sparks "[instructed] the State's [witnesses] not to discuss the case with [defense counsel] or his representatives"; (10) the prosecutor and Deputy Sparks "[instructed] the jurors after the trial not to discuss their actions and statements [in or out of] the jury room with [defense counsel] or his representative."

The first state witness was Ronnie Stewart. Stewart testified that, as he drove by the grocery store at about 4:30 a.m. on May 15, 1989, he did not notice "any unusual activity [there]." On cross-examination, Stewart said "there was no indication of fire in the [store]...."

The next witness, Sandra Brown, testified that she drove by the store about 5:00 a.m. and that "the store was on fire when I went through there." She stated that "the flames were about 3 feet high." Brown also stated that she then noticed that "the top [of the store] on the right side was just starting to burn."

Joe Wayne Jacks, a newspaper carrier, testified that he drove up to the store around 5:10 to 5:15 a.m. on the morning of the fire. He stated that he saw a fire just inside the front door of the building at that time. Jacks described what he saw as "flames and sparks" inside which were "shoulder high." He recalled that he then went across the street to the Ener house, told the residents about the fire and asked them to call for help, and then returned to the store building. Jacks stated that during this time, the fire was "getting bigger and bigger." He related that, in the three to five minutes that elapsed since his arrival at the store, the fire was "coming out the eaves, best I can remember." As soon as Jacks returned to the store, he ran to a corner of the building shouting, and saw appellant coming around the south end of the building. Jacks testified he told appellant, who was holding a "gun of some kind," that the building was on fire. He stated that appellant then said to him, "I thought it was a break-in or I thought I was being broke in." Jacks said that appellant then ran back in the same direction he came from. Jacks stated that he told appellant at that time, "Hurry, we've got

to get them out of there." About three minutes later, he heard appellant shout, "Wayne, Wayne, come help me." Jacks and appellant then went to the back of the building where appellant told him, "Wayne, we've got to get this window out." Jacks related that at that time, appellant was "pulling on the burglar bars...." When the prosecutor asked Jacks whether the back side of the store was on fire, Jacks replied that he, "looked down the store, down the building, [and] couldn't see the fire ... it was dark...." The witness stated that he could tell that the flames "[were] big in there somewhere. Black smoke horribly coming out everywhere." Jacks also testified that appellant told him that he "shook" his wife and step-daughter. Jacks testified that when he first saw appellant, appellant was barefoot and dressed in pajamas. He testified further that, while the fire was raging on the south side of the building, he saw no flames on the north side (where the living quarters were located) until later.

The next State witness, W.F. (Bill) Ener, who lived across State Highway 87 to the west of the building, testified that after Jacks woke him, he dressed and then walked over to the store about ten minutes after Jacks departed. Ener stated that when he arrived, the fire had spread quickly on the south side, "[o]f course, north end of it was just smoke rolling out every crack in it...."

On cross-examination, Ener testified that when he first saw the fire it was small, and located between "the front door [and] counter...." He stated that, at that time, "the whole south end of the store was in flames...." He also affirmed on cross-examination that when the fire was extinguished, "the south side [of the store] was completely destroyed and completely burned to the ground ... and the north side, there was still [a] lot of it standing." Ener also affirmed that the living quarters were located on the north side of the building. He further testified on cross-examination that the main "outside electrical cut-off switch" was on the back or south side of the building. This witness also testified that the appellant stocked "Coleman lan-

tern fuel" and stored it "down on the south end ..." towards the front of the store. When questioned by defense counsel about appellant's relationship with his wife and step-daughter, Ener described those relationships as "good." On re-direct examination, Ener further testified that he had never heard appellant or his wife "speak a word against each other," and that appellant "cared about his wife and that daughter both...."

The next witness to appear for the State was Billy Don Sparks, a deputy sheriff. Sparks testified that he was acquainted with appellant, his wife, and his step-daughter, Michelle. Sparks said that he arrived at the scene of the fire at about 5:35 a.m. and that "there was quite a bit of fire there in the south end but it hadn't broke out of the building at that time."

The next witness for the State was Donald Turk, an investigator for the State Fire Marshall's office. Turk testified that he arrived at the fire scene between 9:30 and 10:00 a.m. on the morning of the fire. He related that he questioned appellant about the fire at that time. Turk said that appellant told him that "he heard a noise in the store and ... got up and went inside the store [from the living quarters]...." Turk also stated that appellant told him that "[appellant] looked into the store [and] saw a fire on or near the floor on the potato chip rack." According to Turk, appellant said "he went back into the living quarters and that he thought he woke up Mrs. Williams and—Michelle." Turk also recounted that appellant told him that he "exited ... the living quarters, went through the door behind the counter ... and around to the electrical boxes ... and turned the electricity off." Turk further testified that appellant told him that "the front door was locked with a dead bolt and also with a chain and padlocked around bars on the door." Turk stated that appellant also told him "that the regular lock [on the back door] was locked ... and then they [had] put a 2 by 4 bar across the door."

Turk testified that he searched the ruins of the building, looking for the "point of origin or the area of origin ... where the fire would have been ignited." He explained that this "point of origin" is the location "at which the most severe damage is sustained." He further stated that the point of origin would be the point at which the fire burned the longest period of time. Based on his investigation and inspection of the premises, Turk concluded and testified that there were "two separate points of origin."

Turk clarified his conclusions by identifying an area near the front door of the building where "spalding" of the concrete slab had occurred. He explained that "spalding" occurred when concrete dried out and "pop[ped] loose" due to intense heat. Turk gave his opinion that spalding was caused here by "[a] flammable liquid of some kind being poured on the floor." He testified that this burn pattern extended to a location just outside one of the two doors to the living quarters, which door was located on the west, interior wall of the quarters. Turk identified the second point of origin of the fire as located on and near the threshold of the door located on the south wall of the living quarters. He testified that the aluminum threshold on that door was partially burned away, and stated that a flammable liquid had been poured across the threshold. State's Exhibits numbered two and three, attached to this opinion as Appendices "B" and "C," demonstrate the "burn patterns" (shown as black areas) identified by Turk during his testimony.

Turk opined that the "fire was set from inside the store" and was intentionally set in both areas. He further testified that he believed both exits leading from the living quarters were blocked by the fires. Turk further related that he found an empty Coleman lantern fuel can inside the building near the back outside door. He related that he collected samples of the burned floor tile in the store and a wooden portion of the threshold from the southernmost door of the living quarters. He identified sites from which these samples were taken by reference to State's Exhibits Two and Three. According to such exhibits, he took samples one and two near the front door,

sample number three (floor tile debris) was collected from near the door at the southwest corner of the living quarters, he took sample four (two samples of glass) from the windows on the front west side and the north side of the building and living quarters, and sample number five (wood debris) was recovered from the remaining portion of the wooden threshold at the door of the living quarters, located near its southeast corner. Turk stated that he took these collected samples to Armstrong Forensic Laboratories at Arlington, Texas, for testing.

The State next called Jacques Kestelyn, a medical doctor. Kestelyn testified that the victim was one of his patients. He first saw her on January 5, 1989, and saw her again on January 16th and 19th, 1989, on February 16, 1989, on March 23, 1989 and finally on May 10th, 1989. Dr. Kestelyn testified that he was treating the victim for "mental depression ... [medically known as] unipolar depression and anxiety." He stated that the victim suffered from "[f]orgetfulness, insomnia, shortness of breath, loss of appetite, frequent headaches, nightmare, nightsweats ... [and] high blood pressure." He said that she steadily improved over the period of time of her visits and was much improved in May, 1989, when he last saw her.

The State called Dr. James Bruce, a pathologist, next. Bruce testified that he performed an autopsy on the victim's body and found that smoke inhalation had produced a fatal level of carbon monoxide (88%) and caused her death.

The State then produced Bill Barcheers, a volunteer fire fighter, ambulance driver and attendant. Barcheers testified that he arrived at the fire scene at about 5:32 a.m. He said at that time the building was "totally involved in flames." He qualified that statement by saying that the fire was in the center of the building and that it had "vented through the roof by the time [he] arrived, at the center of the building."

Following Barcheers' testimony, the defense was permitted to recall Dr. Bruce. Bruce testified, based on the autopsies, that neither the victim nor Michelle[4] was pregnant.

The State next called John Michael Corn, a chemist and employee of Armstrong Forensic Laboratories in Arlington, Texas. Corn stated that his firm specialized in identifying accelerants from fire debris. He related that he received the five samples collected by Turk on May 24, 1989. He stated that the test performed on the burned floor tile sample revealed the presence of a "narrow range petroleum distillate ... known as naphtha" which is a flammable substance. He further stated that no gasoline residue was found, and that naphtha is commonly found in solvents used for paints and lacquers, camp stove fuel and lighter fluids. Sample three was also a piece of partially burned floor tile similar to the tile in sample one. Corn said he found in this sample what he called "hydrocarbon recovery, but ... couldn't match that with any type of known accelerants" as he did with sample one.

Corn testified that sample two consisted of a piece of "hospital type gauze material and a liquid sample." He stated that the test performed on this sample showed it to contain a "hydrocarbon mixture" or "refined petroleum product ..." but that he could not identify what specific type of material it was.

Corn stated that sample four, the window glass, was also tested but the results were negative for accelerants. Corn identified sample five as wood fragments. He related that tests performed on those fragments revealed the presence of the "narrow range petroleum distillate, naphtha, the same kind of accelerant found in sample 1."

On cross-examination, Corn admitted that Coleman lantern fuels are classified within a group of flammables listed by chemists as Class 2 petroleum distillates. Upon further direct and cross-examination, Corn also testified that the flammable accelerant found in samples one and five could be one or more of the following: lantern fuel, certain lighter fluids, or

4. Bruce also performed an autopsy on Michelle's body.

"some solvents used in paints and lacquers."

Next, the State called Dr. Donald Powell, the victim's dentist for the preceding five years. Dr. Powell testified that he went to the grocery store on Sunday, May 14, 1989, and saw that the victim was engaged in a heated conversation with two unidentified young ladies, and that the victim did not recognize him.[5]

The state next called Eleanor Ann Stewart. Stewart testified that she was a friend of the victim. She related that during the six-month period immediately preceding the fire, she witnessed several arguments between appellant and the victim, "[m]ostly pertaining to the store." Stewart also testified that on Sunday, May 14, 1989, she witnessed her daughter telephone the Williams' Grocery Store, say something into the phone and then hang up abruptly. Later that afternoon, after Stewart returned from the cemetery with her mother, whom she and her daughter lived with, the victim and her daughter, Michelle, were there. She stated that she and her mother had a conversation with the victim and Michelle. At that point in the trial, the prosecutor asked Stewart, "And as a result of that conversation what did you and your mother do, if anything?" The witness replied, "Just—we reassured her. We cleaned out part of the house." Following that answer defense counsel objected, arguing that such constituted hearsay and was inadmissible. The court sustained that objection, but allowed the prosecutor to rephrase the question. The prosecutor then reiterated the question, with no substantial change in form, as follows: "After the conversation what did you and your mother do?" Stewart, without objection on the part of appellant, responded that her mother instructed her to "clean part of the house out." Stewart said that she then cleaned and prepared a "huge bedroom" in her mother's house so that the victim and her daughter, Michelle, could move into that room the following morning. The rec-

ord shows that appellant made no objection to this reiterated testimony.

The last witness in the State's case in chief was D.B. Chance, fire chief of the Hemphill Volunteer Fire Department. He said that he went to the fire scene in response to a call at about 5:15 a.m. on Monday, May 15, 1989. He stated that when he arrived the back part of the store "was pretty well in flames." Chance also testified that he found the bodies of the victim and her daughter, Michelle, in the living quarters of the building.

The defense also produced several witnesses. Alice Nell Lewis, appellant's daughter by a previous marriage, testified that the grocery store was part of the community property estate between appellant and his former wife, Margie Nell Williams. She testified that her mother, Margie Nell, was awarded the store property in the divorce proceedings with appellant but that her mother sold the store property sometime after the 1981 divorce decree. Lewis also stated that, at the time of her father's marriage to the victim, the victim "did not have anything."

The next defense witness, James Gobert, a CPA, testified in some detail about the property settlement agreement between appellant and his former wife, Margie Nell Williams. He stated that appellant received large sums in cash and two notes from Margie Nell, in the total amount of approximately $266,000. Gobert also stated that appellant purchased the store a few days after receiving the "pay-off" on a $120,000 note signed by Margie Nell in the divorce settlement. The witness stated that appellant paid $210,000 for the store business and that its value on May 14, 1989, was "probably about the same." On cross-examination, Gobert testified that the store was appellant's only "income producing asset"; and that appellant's 1988 income from the store was between $20,000 and $25,000. The witness testified that appellant "has always been in good financial condition." Gobert also related that

5. Dr. Powell's testimony revealed that he saw the victim only once a year during that five-year period.

appellant maintained a constant inventory in the store with no decrease in value during the year 1989. Gobert said that after appellant married the victim, he prepared the victim's 1983 income tax return and stated that the victim showed her 1983 income to consist only of a salary of $4,000 and $300 in interest income. Gobert testified that the relationship between appellant and the victim was "good."

Austin McLeroy, testified next, stating that he and appellant had been good friends for six or more years and that he saw appellant almost every day. McLeroy said he considered the relationship between appellant and the victim to be "mighty good." McLeroy also testified that the relationship between appellant and Michelle was a "good one." He confirmed that various kinds of liquid containing petroleum distillates were stocked in the grocery store, specifically, lantern oil, WD–40 and charcoal lighter fluid.

Oda Lee Morrison next appeared for the defense. Morrison said he was friends with appellant and had known appellant since appellant was "a little fellow." Morrison related that he had been in the store many times when appellant and the victim were both present. He said their relationship was "a good one," as was appellant's relationship with Michelle. Morrison stated that he visited appellant shortly after the fire and said appellant was mourning the loss of his wife.

After Morrison's testimony, the defense called Claudine Vance. She testified that she lived across Highway 87 from the store, and said that the relationship between appellant and his wife and stepdaughter was "good." Vance stated that on the morning of the fire, she awoke to "loud voices." She said that she then heard glass breaking, went out to her front porch, saw "two people" in front of the store and noticed that the store was on fire. She stated that she heard a man's voice say, "Let's get out of here. Someone has called the fire department." This witness related that she then "ran back in the house, screaming for Dean [her husband] ... I immediately told him that the store

was on fire and I also told him to get his gun. That whoever set it was still down there." She said that her husband went immediately to the store as soon as he got dressed. She testified that she also went to the fire scene about ten minutes later and saw appellant, whom she described as being very "distraught." On cross-examination, Mrs. Vance testified that, when she first saw the fire that morning, "[i]t was a big—big blaze" and that flames were coming "out of the top of the [front] door."

The next witness was Dean Vance, Claudine's husband. Vance corroborated his wife's testimony about the relationship between appellant and his wife and daughter. Next he testified that his wife "was frightened by what she heard" so he got a gun before he went to the front of the store. Vance testified that, when he arrived at the store, it was on fire, but no one was in front of the building. He said he then ran around to the rear of the building "and found Kaufman back there—he was in a panic stage, beating on the bars of the back windows trying to—he was calling for Michelle and Elaine." The witness testified that appellant "was in tears ..."; and that "he had skinned his hands up and [they were] bleeding." Mr. Vance also testified that appellant was very "distressed." He stated that he went to the back door of the building and "the smoke was real heavy down to within 30 inches of the floor. However, I could see underneath the smoke. I could see the fire in the front of the store."

After Mr. Vance was excused, the appellant took the stand in his own defense. On direct examination, appellant recounted a part of his personal history. He related that he and his first wife, Margie Nell Williams, bought the store and some land in Yellow Pine but that he and Margie were divorced in 1981. Appellant related that he and Margie Nell agreed upon a division of their community property estate. He said that, for his share of the community property, he received 80 head of cattle, which he subsequently sold for $13,000, various farm equipment, which he sold for $16,000, and a sum of cash, all amounting to some $82,000. On May 13, 1983, he also received

$120,290 in payment of a note signed by Margie. He testified that six days later, on May 19, 1983, he bought the store from Charles Smith for $210,000. Appellant stated that the entire purchase price for the store business and real estate was paid out of the separate property funds he received in the divorce property settlement. Appellant testified that his wife was "penniless" when they married. Appellant said that the store "was fully stocked" on the day of the fire. He also testified that, at some time prior to the fire, he moved nineteen or twenty guns from his Toledo Bend lake house to the store, where they were located at the time of the fire. Additionally, appellant testified that he had no fire insurance in force on the store at the time of the fire.

During a later phase of appellant's direct testimony, defense counsel introduced several exhibits. Among these was defense Exhibit No. 25, a life insurance policy issued by State Farm Life Insurance Company on March 2, 1984, covering the life of the victim and naming appellant as the "primary beneficiary." The policy was in the face amount of $50,000. Appellant testified that both he and his wife "negotiated" for the policy, but stated that Elaine was the one who decided who the beneficiaries were to be. Appellant thus testified that he knew that the victim had a life insurance policy, but that he did not know that he was the primary beneficiary in the policy until he found the policy sometime after the fire. Next, the defense introduced during appellant's testimony Defendant's Exhibit No. 26, life insurance policy no. LW 3010004, issued on June 6, 1988, by Combined Underwriters Life Insurance Company of Tyler and insuring the lives of appellant and Michelle. The application for the policy reflects that the victim was the first beneficiary, and that appellant was the contingent beneficiary of the policy on Michelle's life in the sum of $10,000. When shown this policy, appellant said that he had no knowledge of it "prior to the fire." Appellant identified Defendant's Exhibit No. 27 as a bank draft drawn by

Combined Underwriters Life Insurance Co. on May 6, 1989, against the account of Williams Grocery at the First State Bank, Hemphill, Texas, in the sum of $49.15. The draft reflects that it was drawn for payment of a premium in the sum of $39.49 on life insurance policy no. LW3010004. Appellant likewise stated that he had no knowledge of the draft, which was drawn monthly and paid before the fire.

Counsel then asked for a description of the layout of the store and the location of various fixtures, inventory and equipment located therein. Appellant introduced Defendant's Exhibit No. 20,[6] a diagram prepared by appellant and his son showing the layout of the building. In reviewing the diagram, appellant stated that plastic bottles of lamp oil were kept on top of the fixture located just south of the front door and labeled on the diagram as the "ice cream cooler." He also related that the diagram showed a rack in the store which contained "various different kinds of oil and other things...." He said the rack was located near the south end of the front (west) wall of the store. Next to that, appellant said he kept the Coleman fuel. Appellant also testified that he had a barbecue pit in a small storeroom, shown on the plat to be located near the rear (east side) of the store building and that he kept charcoal lighter there. He also stated that he had a gasoline powered electric generator at the small storage room, that the tank in the generator held five gallons of gasoline and that he recently had filled it up. He also related that he had an oil lamp sitting on a display shelf, located near the center of the building and shown on the diagram.

Appellant was next questioned by his counsel regarding the manner in which the store building was locked up at night. He testified that the front double doors were regularly locked with a chain and lock on the inside when the family was sleeping in the living quarters located within the store building. When questioned about his relationship with his wife, Elaine, and his stepdaughter, Michelle, appellant said that he

6. That exhibit is attached hereto as Appendix "D."

had a good relationship with his wife and that he "never had any problems" with Michelle. Appellant denied quarreling with his wife on the day before the fire. He stated that he went hunting on Sunday afternoon at about 3:30 or 4:00 p.m. and returned to the store "close to dark." Appellant said that the victim and Michelle were at the store when he arrived and that they had no "cross words." He stated that they closed the store at 10:00 p.m., as they regularly did, chained and locked the front door from the inside, closed the back outside door and "put a bar across it." All of these things, he stated, were in accordance with their "usual procedure." Appellant testified that the three of them then went to bed in the living quarters of the store.

Appellant testified that he was later awakened by "a loud popping and cracking sound." When asked by his counsel to describe the noise he heard, appellant said that he had "never heard anything like that before and [my] first thought ... was [that] someone was in the store and that they were vandalizing the store...." Appellant stated that he then arose from his bed, "got a gun" and went from the living quarters into the store, where he saw a "fire right at the right of the [front] entrance door...." Appellant said that after he saw the fire, he "turned back around [entered the living quarters] and hollered for Elaine and Michelle and told them that the store was on fire." He said that he thought that the victim and Michelle heard him but that he could not say that he "shook them" to wake them up. Upon further questioning, appellant said that he "hollered to them 'the [store is] on fire. Get up, the store's on fire,'" loud enough that he thought they surely heard him.

Appellant then explained that because of the "popping and cracking sound," his "first thought ... was to cut the electricity off." Hence, according to appellant's testimony, he then went out of the building by way of the back (east) door, around to the south end of the building and "pulled the disconnect boxes."[7] Appellant said soon

he saw "someone come around the north end of the building and ... hollered." Appellant stated that the person responded by saying, "This is—Kaufman, this is Wayne [Jacks]. I've already called the fire department." Appellant said he then went to the back door on the east side of the store, where he "expected" to see Elaine and Michelle. He said that since they were not standing there at the back of the store, he then "tried to go back into the store and ... got to the second door and ... couldn't go any further. The smoke almost [choked] me and I stumbled out the back door." After that, appellant said he "went back outside ... to [a] window [on the living quarters] and knocked [the glass panes of] the window out." He also related that he attempted, unsuccessfully, with the help of Wayne Jacks, "to try to get the bars [on the window] out." Appellant later reiterated that he was prevented from entering the building to rescue his wife and step-daughter, not by flames, but by heavy smoke that he described as "just boiling out of there." Appellant denied setting the fire, and said that he had "no reason at all to want [his wife or step-daughter] dead...."

On cross-examination, the prosecutor asked appellant about the "sleeping arrangements ... in the living quarters...." He related that he and the victim slept on a sofa bed and that Michelle slept on a couch next to the victim's side of the sofa bed. The prosecutor asked appellant if Michelle had slept next to him until November 1988. Appellant responded, "That's not true. That has never been true." The prosecutor then asked appellant, "As a matter of fact, ya'll had a lot of trouble about that didn't you?" To that question appellant replied, "No, never. Never."

Later during cross-examination appellant related that the victim had a serious and incurable eye disease. He said that they were advised by the treating doctors that this disease could produce "a prolonged blindness." Immediately following that portion of appellant's testimony on cross-

---

**7.** Defendant's Exhibit 20 shows these "disconnect boxes" to be located outside the building on the south end, near the southeast corner of the building.

examination, appellant was cross-examined as follows:

Q: Okay. Some time in the latter part of November of 1988—I'm sorry, some time in the latter part of the year 1988, perhaps before the month of November, when you had denied that you changed sleeping arrangements, isn't it true that Elaine had occasion to come out from the living quarters and find you and Michelle in a compromising situation?

A: No.

Q: That's not true?

A: That's not true.

Q: And Elaine didn't say to you that I'm not going blind yet?

A: No, she had never said that to me.

Q: Isn't it true that you made many ugly remarks to Elaine about her weight gain?

A: No.

Q: She had gained a lot of weight hadn't she?

A: Tremendous amount of weight, Elaine had.

Q: Isn't it true that Elaine threatened to divorce you in November of 1988?

A: Never did Elaine ever speak to me or talk to me about a divorce.

Q: Isn't it true that things got a little better after you all—after a period of time from November of 1988 through the first part of January—first part of 1989?

A: It couldn't have gotten any better than it already was.

Q: And, isn't it true then that things began to get worse between you and Elaine again?

A: No.

Q: And isn't it true that Elaine had made arrangements to move out?

A: No, not to my knowledge.

Q: And she confronted you with that?

A: No, she never did.

Q: And, isn't it true that you told her—

At this point, defense counsel imposed an objection as follows:

Your honor, we're going to object to this 'isn't it true, isn't it true, isn't it true.'

This is a way to attempt to get out evidence that's not evidence and there's been no evidence of this and can be no evidence of this. I think this constitutes a bad faith attempt to suggest things that do not exist in the evidence. Hasn't been any evidence of any of these things that he suggests here.

The court then called counsel to the bench where an unreported bench conference was conducted. Following such conference, the court overruled the objection, but, at defense counsel's request, instructed the jury "not to consider the questions as any form of evidence, that are being asked, unless evidence is adduced." The record shows that from this point on, the prosecutor dropped that line of questioning and never again propounded any questions directly related to the relationship existing between appellant, the victim and Michelle. The prosecutor inquired only about the sleeping arrangements of appellant, his wife and Michelle on the night of the fire. In response to that questioning, the appellant testified that, on the night of May 14, 1989, he and his wife were sleeping on the sofa bed and Michelle was sleeping on sofa cushions on the floor next to the victim's side of the sofa bed.

On redirect examination, the appellant again denied making any remarks to the victim about her weight problems. He also stated that if he "had it to do over again, when [he] stepped out there and saw the fire ..." he would have gone back into the living quarters and "got Elaine and Michelle and brought them out." He also said on redirect that he had no idea that "a fire would spread in a minute or two and make it impossible for [Elaine and Michelle] to get out...."

We now address appellant's points of error numbered 1, 2 and 3, by which he challenges the sufficiency of the evidence to support his conviction in this circumstantial evidence case.

 Appellant implicitly argues that he had no motive or reason to kill his wife. He notes that the evidence shows that the store building and property were uninsured

and constituted his separate property. He also maintains that his relationship with his wife and step-daughter was good. The State's response to appellant's motive argument correctly states that "it is not necessary to show motive in order to sustain a conviction for murder." (Citing § 19.02 T.P.C. and case law, *e.g.*, *Garcia v. State*, 495 S.W.2d 257 (Tex.Cr.App.1973)). This has long been true in Texas. In *Preston v. State*, 8 Tex.Crim. 30, 38 (1880), the court, confronted with a circumstantial evidence multiple murder case, affirmed the conviction, writing:

> It is true that no motive on the part of appellant to commit this crime is shown, but it is never indispensable to a conviction that a motive for the commission of crime should appear. (Citation omitted.) Who with mortal ken can fathom the human heart and expose all its mysterious promptings? Crimes the most horrible are often committed without apparent motive save an insatiate deviltry which mocks at social restraint and recklessly defies the laws of God and man. While in cases depending on circumstantial evidence the existence or want of motive is sometimes of vital importance, yet the vindication of the law is not made to rest upon so narrow and frail a foundation, nor can the demands of justice be met and foiled by an averment that no motive for the prisoner's conduct has been made to appear.

*Id.* at 38. Almost one hundred years after *Preston* was delivered, the Court of Criminal Appeals summarily disposed of a like contention, writing, "Appellant further contends that the evidence does not show motive. We do not agree, but, under any circumstances, it is not necessary to show motive in order to sustain a conviction for murder." *Garcia*, 495 S.W.2d at 259 (cita-

tions omitted); *see also Rodriguez v. State*, 486 S.W.2d 355, 358 (Tex.Cr.App.1972); *Whitaker v. State*, 160 Tex.Crim. 271, 268 S.W.2d 172, 177 (1954); *Jones v. State*, 153 Tex.Crim. 345, 220 S.W.2d 156, 163 (1949).

◼ Clearly, under section 19.02 of the Penal Code, motive is not an essential element of the offense of murder. However, that is not to say that, in circumstantial evidence cases, the presence or absence of motive on the part of the accused is a fact that may not be considered by the jury. It should be considered by the jury. Indeed, the proof of motive in a circumstantial evidence case may supply the cement that binds the other facts and circumstances together so that those circumstances exclude to a "moral certainty"[8] any "reasonable hypothesis" except the guilt of the accused. On the other hand, when motive is not shown and the circumstantial evidence raises a reasonable hypothesis exculpating the accused, the other facts and circumstances may or may not be sufficiently strong, in the absence of proof of motive, to exclude to a moral certainty that reasonable hypothesis. Utilizing the foregoing analysis in the application of the standard of review prescribed in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the reviewing court must determine whether "the evidence supports an inference other than the guilt of the [accused]...." If it does, the "finding of guilt beyond a reasonable doubt is not a rational finding." *Denby v. State*, 654 S.W.2d 457, 464 (Tex.Cr.App.1983) (quoted with approval in *Skelton v. State*, 795 S.W.2d 162, 167 (Tex.Cr.App.1989)). It is also clear that "if the conclusion [of guilt] is warranted by the combined and cumulative force of all the incriminating circumstances," the conviction should be upheld,

---

**8.** The term or phrase "moral certainty," as used in this analysis, means "[t]hat degree of assurance which induces a man of sound mind to act, without doubt, upon the conclusions to which it leads. A high degree of impression of the truth of a fact, falling short of absolute certainty, but sufficient to justify a verdict of guilty, even in a capital case. Such signifies a probability sufficiently strong to justify action on it; a very high degree of probability, although not demonstrable, as a certainty. [This phrase] has also been used as indicating a conclusion of the mind established beyond a reasonable doubt." BLACK'S LAW DICTIONARY 909 (5th ed. 1979); *Gray v. State*, 57 Okl.Crim. 208, 38 P.2d 967 (1934); *Com v. Costley*, 118 Mass. 23, wherein the court reviewed Bishop Butler's Analogy; *see also Carlsen v. State*, 654 S.W.2d 444, 449 (Tex. Cr.App.1983); *cf. Flores v. State*, 551 S.W.2d 364, 367–68 (Tex.Cr.App.1977) (quoting 24 Tex.Jur. 2d, Evidence, § 742, p. 422).

and such a determination is to be made on a case-by-case basis. *Flores v. State,* 551 S.W.2d 364, 367 (Tex.Cr.App.1977).

In *Carlsen v. State,* 654 S.W.2d 444, 448–449 (Tex.Cr.App.1983) (Opinion on State's Motion for Rehearing), the court wrote that although the evidence in circumstantial evidence cases is not to be tested by an "ultimate" standard different from the standard of review applicable to direct evidence cases, the "exclusion of outstanding reasonable hypotheses" analysis is to be applied to determine the sufficiency of the evidence in circumstantial evidence cases, thereby calling forth the *Jackson v. Virginia* standard of review. 654 S.W.2d at 449. This analysis requires "a process of elimination" of the guilt of those other than the accused in order to "effectively conclude [that] the evidence rationally establishe[s] [the accused's] guilt beyond a reasonable doubt." *Id.; Carlsen* and its progeny, e.g., *Skelton v. State,* 795 S.W.2d 162, 167 (Tex.Cr.App.1989), *Brandley v. State,* 691 S.W.2d 699, 703–704 (Tex.Cr. App.1985), and *Denby v. State,* 654 S.W.2d 457, 464 (Tex.Cr.App.1983), teach that, in applying this "utilitarian" analysis, the evidence is reviewed in the light most favorable to the verdict. A corollary to the above analysis, as previously mentioned, is that "if the evidence supports an inference other than the guilt of the [accused], a finding of guilt beyond a reasonable doubt is not a rational finding." *Skelton v. State,* 795 S.W.2d at 167 (quoting *Denby v. State,* 654 S.W.2d at 464); *Brandley,* 691 S.W.2d at 703–704; see also *Carlsen v. State,* 654 S.W.2d at 449.

In the course of his arguments, appellant cites us to *O'Keefe v. State,* 687 S.W.2d 345 (Tex.Cr.App.1985), and *Baugh v. State,* 776 S.W.2d 583 (Tex.Cr.App.1989). We conclude that these cases are inapplicable to the analysis we make here. This record contains undisputed expert testimony that the fire was of incendiary origin and was set by a person inside the building by pouring flammable liquids on the floor near the front and rear entrances to the building. Also, the record reveals without dispute that appellant and the two victims went to bed in the living quarters of the building

sometime shortly after 10:00 p.m., that the fire started sometime shortly after 5:00 a.m. on the next morning, and that only appellant escaped. Moreover, independent of the conflicting evidence respecting appellant's possible motive for the commission of the offense, the record shows that appellant, after seeing the fire, only shouted to his wife and step-daughter that the store was on fire before he fled the building. He admits that he did not even make sure that they were awake before he exited through the back door.

We conclude that the circumstantial evidence adduced is amply sufficient to exclude to a moral certainty the reasonable hypothesis raised by the evidence that the fire was accidentally started by an electrical mishap. We also conclude that the evidence does not raise a reasonable hypothesis that someone other than appellant set the fire. We are of the opinion that, neither the testimony of appellant nor that of State witness Claudine Vance, is sufficient to raise that hypothesis, but, even if it is, the other circumstances and facts adduced disprove that hypothesis beyond a reasonable doubt. Consequently, we conclude, viewing the evidence in the light most favorable to the verdict, that any rational juror could have found beyond a reasonable doubt that each essential element of the offense was established. *Jackson v. Virginia.* Appellant's points of error 1, 2 and 3 are overruled.

With respect to appellant's fourth and fifth points of error, our review of the record demonstrates that appellant made no objection to the arguments complained of therein and, therefore, the alleged errors were not preserved for review. Tex. R.App.P. 52(a). These points of error are overruled.

■ Appellant argues under his sixth point of error that the court erred in overruling his motion for new trial because of inadmissible hearsay testimony admitted during the testimony of Eleanor Stewart. The record clearly shows that the prosecutor did not "rephrase" the questions at issue but simply reiterated them, and that

Stewart gave her answers to those several questions without objection by appellant to either the reiterated questions or to the responses of the witness. Additionally, appellant did not request a "running" or "continuing" objection to either the initial questions or to the witness' responses thereto. Consequently, no error was preserved. Tex.R.App.P. 52(a); *Sattiewhite v. State*, 786 S.W.2d 271, 283–84, n. 4 (Tex.Cr. App.1989). Appellant's sixth point of error is overruled.

■ Under his eighth point of error, appellant complains of the court's refusal to allow him to take the deposition of the State's expert witness, Donald Turk. Appellant alleges that he had good cause to take that deposition because Turk's at-trial testimony "was at variance with his [pretrial] written report." Under Tex.R.App.P. 50(d), the burden is on the appellant to produce "a sufficient record" to demonstrate the error that warrants reversal of his conviction. Because Turk's pretrial report is not included in the record, we are unable to assess the validity of the allegation made, or whether harm resulted from the alleged error. The record does show that, before trial, appellant was furnished with the photographs, diagrams, and all physical evidence used or prepared by Turk as a basis for his opinion testimony, as well as a copy of his written report. Hence, appellant, in his cross-examination of Turk, had ample opportunity to impeach Turk by exposing any material variances or conflicts between Turk's written report and his at-trial testimony. Moreover, the record contains no evidence that demonstrates any harm to appellant because of the court's refusal to allow him to take Turk's deposition. Therefore the trial court did not abuse its discretion. *See May v. State*, 738 S.W.2d 261, 273 (Tex.Cr.App.1987). Appellant's eighth point of error is overruled.

We have carefully reviewed the record made at the hearing of appellant's motion for new trial respecting the allegations of error set forth in appellant's ninth and tenth points of error. We conclude that the record does not support appellant's allegations that the State's attorney or Deputy Sheriff Sparks instructed the State witnesses "not to discuss the case" with appellant's counsel or that either of them instructed the jurors not to discuss their actions and statements "in ... or out of the jury room" following receipt of the verdict. Therefore, we conclude that the trial court did not abuse its discretion in overruling appellant's motion for new trial. Appellant's ninth and tenth points of error are overruled.

■ By his seventh point of error, appellant claims that the trial court erred in overruling his motion for new trial because of the trial court's earlier error in overruling his objection "to the actions of the [prosecutor] in attempting to get evidence before the jury in the form of his questions only...." Appellant alleges that said evidence intimated that appellant was guilty of adulterous behavior with his step-daughter, Michelle, and that such conduct "was discovered by [the victim] and led [her] to make arrangements to move out ...," all despite the absence of any evidence to support such a claim. Appellant accuses the prosecutor of intentionally planning "to prejudice the jury with 'hints' or 'suggestions' of misconduct." He further argues that the court's instruction to the jury regarding counsel's questions was "ineffective, as the damage was done and the matters were too inflammatory and harmful to [him] to be removed from the minds of the jurors." Appellant accuses the prosecutor of intentionally planning "to prejudice the jury with 'hints' or 'suggestions' of misconduct." In support of these arguments, the appellant cites *Rogers v. State*, 725 S.W.2d 350 (Tex.App.–Houston [1st Dist.] 1987, no pet.), and *Scruggs v. State*, 782 S.W.2d 499 (Tex.App.–Houston [1st Dist.] 1989, pet. ref'd).

Appellee counters these arguments by claiming that the form of the questions propounded by the prosecutor was acceptable on cross-examination because appellee had a right to ask leading questions, citing *Lawson v. State*, 697 S.W.2d 803 (Tex. App.–Houston [1st Dist.] 1985, *vacated and remanded*, 752 S.W.2d 565 (Tex.Cr. App.1988). The declaration in *Lawson*, re-

lied on by appellee is, "[t]here is a distinct difference between being allowed to 'cross-examine' and 'to place the child on the witness stand.' In cross-examination there is a right to lead, and the examiner is not bound by the testimony received." 697 S.W.2d at 806. This language in *Lawson* was employed in the context of a defendant's confrontation rights with a child who testified by video in a sexual assault prosecution pursuant to TEX.CODE CRIM. PROC.ANN. art. 38.071 (Vernon Supp.1991). The case is inapposite here. The State further contends that the prosecutor's questions were proper under *Brown v. State*, 617 S.W.2d 234 (Tex.Cr.App.1981). We conclude that the appellee's reliance on *Brown* is likewise misplaced. That case has absolutely nothing to do with the type of prosecutorial misconduct complained of here. The incriminating "evidence" complained of here comes from the questions not the answers. The harm here is signaled by the "isn't it true" character of the questions asked. Certainly these questions, by innuendo, suggest that the prosecutor knows something from some source that he cannot otherwise introduce into evidence. Finally, the appellee argues that *Stahl v. State*, 749 S.W.2d 826 (Tex.Cr. App.1988), sets out factors which should be considered in determining whether reversible prosecutorial misconduct exists in the case. These factors are three: (1) whether the "defendant objected to the conduct ..."; (2) whether the prosecutor was, "by [his] actions deliberately violating an express court order"; and (3) whether the misconduct at issue was "so blatant as to border on being contumacious." *See Stahl,* 749 S.W.2d at 831.[9] Appellee argues that none of the *Stahl* factors are present in this case, and that, although the objection was untimely and was overruled, the court nevertheless gave curative instructions; that no "express or implied" court order was violated; and finally, that "there was no misconduct, much less contumacious actions." Appellee also maintains that there "were no side-bar remarks"

made, and no "repetitious questions" propounded.

As the appellee concedes, the Court of Criminal Appeals has yet to establish a complete standard for the review and determination of prosecutorial misconduct, and the factors set forth in *Stahl* are "neither exhaustive nor mandatory." They simply "provide a starting point" for establishing reversible conduct. *Stahl,* 749 S.W.2d at 831. In *Stahl,* the offensive conduct was the insistence of the prosecutor who called the murder victim's mother as a witness, that the mother identify a photograph of her deceased son before the jury when the prosecutor had good reason to know that the witness would become hysterical as she viewed the photograph. Given the character of conduct here involved, any attempt to apply *Stahl* with our case is fruitless. We conclude that *Stahl* does not control our decision here. Rather, we look to such cases as *Huffman v. State*, 746 S.W.2d 212 (Tex.Cr.App.1988), and *Brown v. State*, 692 S.W.2d 497 (Tex. Cr.App.1985). Those cases declare that "the general rule is that [the] error in asking an improper question 'may be cured or rendered harmless by its withdrawal or an instruction to disregard.' (Citation omitted.) The exception occurs in 'extreme cases where ... the question ... is clearly calculated to inflame the minds of the jury and is of such a character so as to suggest the impermissibility of withdrawing the impression produced.' " (Citations omitted.) *Huffman v. State*, 746 S.W.2d at 218; *see also Brown,* 692 S.W.2d at 501. In the case before us, we are persuaded that the "isn't it true" questions propounded to appellant by the State's attorney during his cross-examination were improper and constituted misconduct of a character calculated to prejudice the jury against appellant. Indeed the questions posed were impermissibly suggestive of facts, never established, that appellant had engaged in adulterous behavior with his step-daughter and that the victim "caught him in the act." In our view, no proper curative instructions could have removed that prejudice or impression

---

9. These factors were derived by the *Stahl* Court from *Landry v. State*, 706 S.W.2d 105, 111 (Tex. Cr.App.1985, *cert. denied,* 479 U.S. 871, 107 S.Ct. 242, 93 L.Ed.2d 167 (1986).

from the minds of the jurors. The record demonstrates that appellant's objection to the questions was untimely and therefore properly overruled. In the face of that adverse ruling, appellant then resorted to a request for an instruction to the jury "not to consider the [prosecutor's] questions as any form of evidence...." Appellant failed to make a mistrial motion based on such misconduct during trial, but raised the issue for the first time in his motion for new trial. Hence, we conclude that the complaint is not preserved for review. TEX. R.APP.P. 52(a); *cf. Fuentes v. State*, 664 S.W.2d 333, 335–337 (Tex.Cr.App.1984). We overrule appellant's seventh point of error.

The judgment is affirmed.

## APPENDIX A

APPENDIX B

Solid Red Indicates
burn pattern on tile

## APPENDIX C

Solid red indicates burn pattern on floor tile.

APPENDIX D

